**B.F. GOODRICH COMPANY, Plaintiff,**

**v.**

**FORMOSA PLASTICS CORPORATION, et al., Defendants.**

Civ. A. No. V–84–2.

United States District Court,
S.D. Texas,
Victoria Division.

July 2, 1986.

V. Bryan Medlock, Jr., Richards, Harris & Medlock, Dallas, Tex., J.C. Trevino, III, Mann, Freed, Trevino & Hale, Laredo, Tex., for plaintiff.

James J. Sentner, Jr., Vidal G. Martinez, Haight, Gardner, Poor & Havens, Houston, Tex., Carl M. Barto, Local Counsel, Alvardo & Barto, Laredo, Tex., for defendants.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

Pending resolution is the motion by Plaintiff B.F. Goodrich Company ("Goodrich") to disqualify the law firm of Arnold, White & Durkee as attorneys for the Defendants Formosa Plastics Corporation, et al. ("Formosa"). After conducting an evidentary hearing and reviewing affidavits and exhibits, the United States Magistrate filed findings and a recommendation that the motion should be granted. Formosa has timely objected to the Magistrate's report.

■■■ The law in the Fifth Circuit applicable to this motion is reasonably clear. To disqualify opposing counsel, the movant must first prove the existence of a prior attorney-client relationship. Then, if the movant proves that the matters embraced within the pending suit are "substantially related" to the matters wherein the attorney previously represented him, the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.1981); *In Re Corrugated Container Antitrust Litigation,* 659 F.2d 1341, 1345 (5th Cir. 1981). Even in the absence of a prior attorney-client relationship, there might still exist a fiduciary obligation which could result in the disqualification of the attorney. For example, where information was exchanged among co-defendants and their attorneys in a criminal case, an attorney who was the recipient of such information would breach a fiduciary duty if in a later case, while representing another client, he was able to use this information to the detriment of one of those co-defendants, even though he never actually represented that co-defendant. *Wilson P. Abraham Const. v. Armco Corp.,* 559 F.2d 250 (5th Cir.1977). In that situation, however, because there was no direct attorney-client relationship between the attorney and the party seeking to disqualify him, there was no presumption that confidential information was exchanged between them. Instead the movant would have to prove that fact. *Id.* at 253.

In the instant case, it is clear that whatever relationship previously existed between Goodrich and the Arnold firm did substantially relate to the instant cause of action, thus satisfying the second prong of the *Duncan* test. The critical question is whether that prior relationship constituted an attorney-client relationship under the first prong of *Duncan,* thus triggering the irrebuttable presumption that relevant confidential information was exchanged. The Magistrate did not squarely decide this point. Instead he found it "arguable that an express attorney-client relationship blossomed" during the prior relationship and concluded that "at the very least, a fiduciary relationship and/or implied attorney-

client relationship existed which should satisfy the first prong of the test." While the call is a close one, with little legal precedent to illuminate the path, this Court finds that there was not a previous attorney-client relationship between Goodrich and the Arnold firm.

The undisputed evidence is that when Goodrich began to contemplate the filing of this lawsuit, its General Patent Counsel, John D. Haney, determined that the services of outside counsel would be required. He then prepared a list of "outside prominent trial lawyers who had experience in patent cases" (TR. 20) [1] and determined to interview them for potential employment. Ultimately five lawyers were interviewed. Bill Durkee of the Arnold firm was the fourth of these five. The meeting with each attorney took one day. Haney made an effort to conduct the meetings "exactly the same as we could" (TR. 56) in order to have an accurate basis for comparing the interviewed lawyers. (TR. 77). Durkee flew from Houston, Texas to Goodrich's offices in Akron, Ohio for the interview. It was understood that the interview with Durkee, as with the other attorneys, was for the purpose of determining which attorney Goodrich would ultimately retain. In his affidavit, Durkee asserted without contradiction that he was specifically informed by Goodrich that he was only one of several attorneys being considered for the case. Durkee's interview occurred on December 14, 1983, and upon its conclusion he returned to Houston. He was not told during the interview that he had been hired as Goodrich's attorney. (TR. 70). By letter dated January 6, 1984, (DX. 2) Haney advised Durkee that Goodrich had "decided to retain another firm" in this matter. The letter added that Goodrich appreciated Durkee's "willingness to visit us here in Akron and to have had the opportunity to meet you." It concluded by stating that Goodrich would be "pleased to cover (Durkee's) time and cost for our visit." Durkee there-

upon submitted a bill for $3,173.00, which included his time and expenses.

■ The Court finds from these undisputed facts that Goodrich has failed to prove the existence of an attorney-client relationship between Goodrich and the Arnold firm during this employment interview on December 14, 1983. The meeting was clearly one of several meetings wherein Goodrich summoned attorneys to Ohio for interviews. Thereafter, Goodrich decided which of the interviewees it would retain as its attorney. Upon concluding the five interviews, Goodrich did not choose the Arnold firm. The Court need not and does not decide whether an attorney-client relationship ever develops during the initial interview between a lawyer and an individual seeking his services. The Court only holds that under the facts of this case, there was clearly no intention on Goodrich's part to enter into such a relationship with Durkee during the initial interview. Instead, Goodrich was reserving unto itself the right to make a decision after meeting with all five candidates. Goodrich basically designed and controlled the structure of each interview for the express purpose of facilitating comparison of the candidates. Only Goodrich attorneys met with the candidates and those attorneys regulated what information was furnished to each candidate.

The fact that the attorney-client relationship had not yet been established does not mean that the Arnold firm owed no duty whatever to Goodrich. Ethical Consideration 4-1 of the Code of Professional Responsibility, adopted in Texas and elsewhere, states that a lawyer must preserve the confidences and secrets of one who has "sought to employ him." *See Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.1978). The Court concludes that the instant situation is governed by the holding in *Wilson P. Abraham Const. v. Armco Steel Corp.*, *supra*. That is, the Arnold firm should be

---

**1.** All citations to a transcript refer to the "Statement of Facts" of the Magistrate's hearing of December 16, 1985.

disqualified if, but only if, Goodrich can prove that the firm actually received confidential information which could now be used to the detriment of Goodrich. The Court concludes that Goodrich has failed to meet that burden of proof.

The testimony of Mr. Haney revealed that attorney Durkee's meeting was solely with Haney and other in-house attorneys for Goodrich. Durkee was not shown any actual test reports prepared by Goodrich nor did he meet with any laboratory technicians, scientists, or other non-legal Goodrich personnel. (TR. 59; 70–71). Durkee was not asked for nor did he give any written opinion on any aspect of the potential suit against Formosa. (TR. 72–73). At least part of the interview was consumed with what Haney described as "logistics," (TR. 25), that is, a discussion by Durkee of which attorneys would actually work on the case, their fee schedule, and the general methods that his firm would employ to handle a lawsuit of this type. That topic clearly did not involve any confidential disclosures by Goodrich. If anything, that information could conceivably prove useful to Goodrich if the Arnold firm remains in this case.

Mr. Haney then described the other topics that were discussed at the employment interview, as follows:

a. A summary by Haney of Goodrich's status "in connection with the P.V.C. business" (TR. 24);

b. Goodrich's prior relations with Formosa, including Goodrich's evidence to date of a possible patent infringement on the part of Formosa (TR. 24);

c. The advisability of joining a breach of contract claim to the proposed patent infringement claim against Formosa (TR. 24–25);

d. The likelihood that Formosa, if sued for patent infringement, would counterclaim charging Goodrich with an anti-trust violation (TR. 25);

e. Which forum should be selected by Goodrich for the proposed suit (TR. 25).

The Court has carefully considered Mr. Haney's own elaboration on these topics and concludes that none of them involved the exchange of any confidential information which could be detrimental to Goodrich in this case. Mr. Haney conceded that his rendition of "the historical account of Goodrich's activity in the P.V.C. business" was not confidential. (TR. 60). Likewise he testified that he did not consider the discussions about Goodrich's historical relationships with Formosa to involve the disclosure of any confidential information. (TR. 60). With respect to the possible contract claim, Haney indicated that his discussion with Durkee solely involved whether or not it would be wise tactically to join a contract claim with a patent infringement claim in the prospective lawsuit. He agreed that Goodrich "eventually dropped it (the contract claim) on the theory that we didn't want to clutter up the patent case with a contract claim." (TR. 62). Thus the only information Durkee obtained on this point was the fact that Goodrich at one time thought about joining a breach of contract claim with the instant patent infringement claim. Asked how that information could possibly be considered damaging or confidential, Haney could only speculate that "if a lawsuit were brought, I think Formosa could prepare for that possibility by destroying evidence, for example; cleaning out files ... I think there's lots of possibilities." (TR. 61). The fact is that no contract claim was asserted, and the Court cannot find any confidential information involved in the knowledge that Goodrich once considered filing such a claim. "A potential conflict based on potential issues is simply not the standard." *Hydril Co. v. Multiflex, Inc.*, 553 F.Supp. 552, 556 (S.D.Tx.1982). With respect to the anti-trust counterclaim, Haney explained that Goodrich's evidence of patent infringement was positive but not conclusive. His discussion with Durkee was that "if the evidence failed for some reason, in an infringement suit, in other words, we could not prove infringement, we would be probably vulnerable to at least a charge, anyway, that we were somehow abusing mar-

ket power and all that sort of thing ..." (TR. 63). Haney conceded that "anti-trust counterclaims in patent cases are commonplace" and that, at least at one time, a plaintiff claiming patent infringement would "normally expect" to have a counterclaim lodged against it for anti-trust violations. (TR. 62). The court finds that discussing the possibility that a counterclaim might be filed in this case does not constitute the disclosure of any confidential information. With respect to the forum of this suit, the so-called "venue issue," Haney essentially conceded that once Goodrich selected its forum by filing this suit, prior discussions about the possibilities of filing the suit in other jurisdictions are not only non-confidential but largely irrelevant. Straining to find possible prejudice, Haney opined that it would still be possible for the Defendants "to begin a series of declaratory judgment actions in a series of different venues all over the country just for harassing purposes," (TR. 66), and that the confidentiality aspect is that "now Formosa Plastics knows how really worried I am about it, and was then." (TR. 66). The Court finds that this testimony borders on the frivolous.

The only topic of discussion which even arguably involved confidential information was the disclosure by Haney to Durkee that Goodrich's laboratory tests to date did not conclusively establish patent infringement by Formosa. When the instant suit was filed, however, Goodrich publicly disclosed basically this same information. Simultaneously with the filing of its complaint, Goodrich filed an Ex Parte Motion for Expedited Discovery, with supporting memorandum. Those documents essentially alleged that Goodrich had tested a sample of a plastic product produced by Formosa and had determined that the product had "probably been made by the use of" Goodrich's patented technology. Goodrich further alleged, however, that further testing was required by it to "conclusively prove infringement." Thus by the time Formosa retained the services of the Arnold firm, it

was obvious that Goodrich's tests to date were inconclusive. Asked what confidential information was previously given to Durkee under these circumstances, Haney responded that Durkee had been told that Goodrich's tests "indicated a seventy to eighty percent probability that there was infringement" by Formosa. (TR. 64). In essence, Goodrich concedes that the fact that its previous tests were inconclusive is not confidential but claims that the percentage of "inconclusiveness" was confidential. The Court cannot agree that this somewhat subtle distinction could be detrimental to Goodrich. This is especially true since Durkee was not actually shown any actual test reports or allowed to talk with any Goodrich employees having first-hand knowledge of the facts. Moreover, it is difficult to understand, and Goodrich does not explain, why knowledge that its preliminary tests were 80% positive for patent infringement would be detrimental to Goodrich.

■ The foregoing analysis relates to Canon 4 of the Code of Professional Responsibility. Although Goodrich has not specified the basis for its motion, the Court concludes that the "amorphous standard" of Canon 9 [2] would likewise not result in disqualification of the Arnold firm. To disqualify under that canon, the Fifth Circuit requires the movant to show a reasonable possibility of the occurrence of "specifically identifiable appearance of improper conduct" and that the "likelihood of public suspicion or obloquy outweighs the social interest" in obtaining counsel of one's choice. *In Re Corrugated Container Antitrust Litigation,* 659 F.2d at 1345. The Court has already concluded that there was no showing of a violation of Canon 4 and Goodrich has not specifically identified any other allegedly improper conduct. Moreover the Court finds no likelihood that the participation of the Arnold firm in this case, under the circumstances described above, would likely arouse public suspicion or tarnish the image of the legal profession. In this connection, the rule of dis-

---

2. *In Re Corrugated Container Antitrust Litigation,* 659 F.2d at 1345, n. 9.

qualification is not mechanically applied, and an attorney's conduct need not be governed by standards that can be imputed only to the most cynical members of the public. *Church of Scientology of California v. McLean,* 615 F.2d 691, 693 (5th Cir.1980). Indeed, there is some merit to Formosa's suggestion that disqualifying all the lawyers interviewed by a company for prospective employment would itself undermine the public's confidence in the judicial process.

For the foregoing reasons, the recommendation of the Magistrate is rejected. It is ORDERED that Goodrich's motion to disqualify the firm of Arnold, White & Durkee is DENIED

The Magistrate is DIRECTED to forthwith meet with the parties to set reasonable discovery and motion deadlines and to fix a date for the filing of the final pre-trial order.