**POLY SOFTWARE INTERNATIONAL, INC., a Utah Corporation Plaintiff,**

v.

**Yu SU, Ping Zhang, and Hua Zhang, individuals, DATAMOST CORPORATION, a Utah Corporation, and John Does 1–5, Defendants.**

**DATAMOST CORPORATION, a Utah Corporation, Counterclaimant,**

v.

**POLY SOFTWARE INTERNATIONAL, INC., a Utah Corporation, and Xiaowu Wang, an individual, Counterdefendants.**

No. 94–C–1085W.

United States District Court,
D. Utah,
Central Division.

March 31, 1995.

Paul M. Durham, J. Mark Gibb, Durham, Evans, Jones & Pinegar, Salt Lake City, UT.

Berne S. Broadbent, Gary D. Pierce, Berne S. Broadbent, P.C., Salt Lake City, UT, for plaintiff.

Lynn G. Foster, Brett L. Foster, Foster & Foster, L.C., V. Roland Smith, Thorpe, North & Western, Salt Lake City, UT, for defendants.

WINDER, Chief Judge.

This matter is before the court on cross-motions to disqualify counsel. Plaintiff and Counterdefendant Poly Software International ("Poly Software") has moved for the disqualification of Lynn G. Foster and the firm of Foster & Foster. The current CEO of Poly Software is Xiaowu Wang ("Wang"). Defendants and Counterclaimants Yu Su, et al., ("Su") have moved for the disqualification of Berne S. Broadbent and the firm of Berne S. Broadbent, P.C. A hearing on these motions was held on February 16, 1995. Paul M. Durham and Berne S. Broadbent appeared on behalf of Wang and Poly Software, and V. Roland Smith, Lynn G. Foster, and Brett L. Foster appeared on behalf of Su, and Datamost Corporation ("Datamost"). Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to the motions. Now being fully advised, the court enters the following memorandum opinion and order.

## I. BACKGROUND

Treatment of the disqualification motions at issue requires a brief account of the previous dealings of the parties. In 1989, Su was employed as a software engineer by Micromath, Inc., a company specializing in the development and marketing of mathematical software. Wang joined him in the same capacity in 1990.

In the summer of 1992, both Su and Wang left Micromath, formed a partnership ("Poly-soft Partnership"), and began producing their own line of mathematical graphing soft-

ware. Micromath subsequently sued the Polysoft Partnership for copyright infringement. The focus of the Micromath litigation was a Polysoft Partnership product entitled "Techplot," later renamed "PS Plot," and then "PSI–Plot." Micromath claimed that Wang and Su had obtained user's handbooks and computer source code while working for Micromath, and illegally employed that information in their development of Techplot.

Soon after the complaint was filed the parties agreed to submit their dispute to mediation, a non-binding alternative to formal litigation, and chose Berne S. Broadbent ("Broadbent") to serve as mediator. Broadbent conducted a series of intensive meetings, conferring with the parties both individually and together. During Broadbent's private caucuses with the Polysoft Partnership both Wang and Su were present and openly discussed confidential aspects of their case, including detailed analysis of their source codes and handbook comparisons. At the conclusion of the mediation process Micromath and the Polysoft Partnership successfully negotiated a settlement of their dispute.

Subsequent to the settlement of the Micromath litigation, the Polysoft Partnership continued to market PSI–Plot, and began developing new programs. Two of these were "PSI–Stat," and "PSI–Math." However, in December of 1993, Wang and Su dissolved the partnership. Under the terms of the dissolution, Su surrendered his ownership interest in the Polysoft Partnership to Wang, and received the rights to the PSI–Stat software. Wang retained the rights to the PSI–Plot and PSI–Math programs. Subsequently, Wang restructured the business as Poly Software International, Inc., and Su formed Datamost Corporation.

The present litigation was commenced on November 7, 1994, when Poly Software filed an action asserting copyright infringement and other related claims against Su and various other employees of Datamost. In substance, those claims asserted that "Statmost for DOS," Datamost's version of the program

PSI–Stat (the rights to which had passed to Su upon dissolution of the Polysoft Partnership) illegally duplicated significant portions of the PSI–Plot User's Handbook, and incorporated source code unique to PSI–Plot.

Prior to commencing suit, Wang interviewed a number of attorneys for the purpose of finding a law firm to pursue his claim against Su and Datamost. One of those attorneys, Lynn G. Foster of the firm Foster & Foster, met with Wang in October of 1994. No fee was charged for this initial interview. Foster asserts that the meeting began at about 5:30 p.m., and lasted less than 30 minutes.[1] He also claims that Wang was given two options for the interview. One option would primarily focus on the fee schedule of the firm and outline the policies employed in pursuing litigation. Under this option, the potential client would give only a very general description of the litigation proposed. The second option would involve a much more significant interview, focusing on specific details of the potential client's case. Foster asserts that Wang chose the first option, and that Wang disclosed only that "he had a dispute against a former partner, software was involved, and there was some type of prior settlement agreement." Wang, on the other hand, claims that the meeting was over an hour long, that he specifically discussed the evidence relevant to the proposed litigation, disclosed potential strengths and weaknesses of his case, displayed the user's handbooks printed by both companies, and compared a printout of portions of defendants' "materials" with those of Poly Software.

## II. *DISCUSSION*

■ "[T]he control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge,' and is thus a matter of judicial discretion." *Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373, 1383 (10th Cir. 1994). When a federal district court is presented with a motion to disqualify, it relies on two sources of authority to guide the

---

1. Wang testified briefly at the hearing before this court. He speaks and understands English, but his heavy accent nonetheless raises somewhat of a language barrier. In particular, Wang must often repeat what he says in order to make himself effectively understood. Foster claims that communication difficulties in his interview with Wang prevented them from discussing anything beyond the bare essentials of the case during the short time allotted.

exercise of its discretion. The first source is "the local rules of the court in which [attorneys] appear." *Id.* Rule 103–1(h) of the Rules of Practice for this district states that attorneys "shall comply with the rules of practice adopted by this court, and unless otherwise provided by these rules, with the Utah Rules of Professional Conduct, as revised and amended and as interpreted by this court." *See Parkinson v. Phonex Corp.,* 857 F.Supp. 1474, 1475 (D.Utah 1994). Additionally, "because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law.... [and are thus] governed by the ethical rules announced by the national profession and considered 'in light of the public interest and the litigants' rights.'" *Cole,* 43 F.3d at 1383 (quoting *In re Dresser Indus. Inc.,* 972 F.2d 540, 543 (5th Cir.1992)).

### A. The Motion to Disqualify Lynn G. Foster

Rule 1.9 of the *Utah Rules of Professional Conduct* [hereinafter *"Utah Prof.Conduct Rules"*] governs Poly Software's motion to disqualify Lynn G. Foster and the firm of Foster & Foster. That rule forbids an attorney who has formerly represented a client from:

(a) Represent[ing] another person in the same or a substantially factually related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) Us[ing] information related to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.[2]

■ Hence, a party wishing to disqualify opposing counsel under Rule 1.9 must demonstrate three factors: (1) that a previous attorney-client relationship arose with the moving party; (2) that the present litigation is "substantially factually related" to the pre-

vious representation; and (3) that the attorney's present client's interests are materially adverse to the movant. *See Cole,* 43 F.3d at 1384. In this case, Wang convened with Foster for the purpose of determining whether Foster would represent Poly Software in the very litigation for which Foster eventually was retained by the opposing side. Hence, the second and third factors are clearly demonstrated. The determinative question, then, is whether an attorney-client relationship ever arose between Wang and Foster.

■ Nevertheless, because ethical rules are generally concerned with the behavior and regulation of the legal profession, and more specifically here with the protection of communications that a reasonable person would assume to be confidential, the various legal criteria employed to determine a client relationship under agency or other contractual employment theories do not necessarily provide the appropriate answer to that question. Nor, frankly, does existing case law. A number of cases, for instance, have formulated a rule for an "implied" attorney-client relationship in situations where formal contracts have not been executed or fees have not been paid. *Cole,* 43 F.3d at 1384; *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1317 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). Typically, to demonstrate an implied attorney-client relationship under Rule 1.9 a "party must show that (1) it submitted confidential information to a lawyer and (2) it did so with the reasonable belief that the lawyer was acting as the party's attorney." *Cole,* 43 F.3d at 1384. *But see Dalrymple v. National Bank & Trust Co. of Traverse City,* 615 F.Supp. 979, 982 (W.D.Mich.1985) (holding "focus is on the putative client's subjective belief that he is consulting a lawyer in his professional capacity, and on his intent to seek professional legal advice").

■ This rule, however, may not adequately address the situation involving an initial interview (such as that occurring be-

---

2. Poly Software also cites Rule 1.6, which forbids the revelation of information relating to the representation of a client. As can be seen from the

text here cited, that provision is effectively incorporated by 1.9 in the context of subsequent representation of an adverse party.

tween Wang and Foster) where both parties understand that the relationship is potential, not implied or actual. *See B.F. Goodrich Co. v. Formosa Plastics Corp.,* 638 F.Supp. 1050, 1052 (S.D.Texas 1986) (holding all-day interview insufficient to form attorney-client relationship where potential client was in process of conducting several interviews). Even in such an initial interview both the attorney and the potential client may find it quite tempting to discuss the case as frankly as possible, enabling them to more clearly assess the desirability of undertaking a formal, perhaps costly, attorney-client relationship. It also seems quite likely that at the outset nonlawyers will not always appreciate the possibility that, should they choose not to enter a formal relationship, the attorney may be free to work for the other side in the same legal dispute. Justice will be hampered and the stature of the legal profession harmed if, to the surprise and dismay of persons who have assumed that their initial discussion was confidential, attorneys subsequently represent the opposing side in a dispute.

Balanced against these considerations, however, is the public interest of allowing clients (and attorneys) to freely choose their employment arrangements. It may often be necessary for potential clients to interview a number of lawyers before settling on the lawyer or firm that best meets their expectations. In this vein, it is critical to avoid a situation where a person, merely by arranging employment interviews, renders a large number of attorneys unavailable for the opposing party.[3] The present conflict between Wang and Su may well be a case in point. Wang (quite understandably) visited a number of local attorneys who focus on intellectual property litigation before entrusting his proposed lawsuit to one of them. Although the Wasatch Front is a moderately-sized urban area, attorneys specializing in such fields are not overwhelmingly plentiful.[4] If the ethical rules disqualified every attorney granting an initial interview, Wang, in a very short time period, could have (even unintentionally) forced his opponent to seek inexperienced or out-of-state counsel.

Constructing a rule which best strikes the appropriate balance between the competing considerations is not an easy task. The best solution is for attorneys to avoid the dilemma altogether by adequately controlling the initial interview.[5] In this case Foster claims he did precisely that by offering Wang two options for the interview: one to involve a fairly cursory overview of the proposed litigation, and the other to involve a more detailed, in-depth discussion. According to Foster, Wang explicitly chose the first option, their discussion consumed less than a half-hour, and no details of the proposed litigation were revealed. Wang claims he revealed considerably more. After carefully weighing the conflicting affidavits and testimony describing what occurred during the interview and how long it lasted, this court finds Foster's version to be the more credible of the two. As a result, this court also holds that the degree of confidentiality established in the interview was insufficient to preclude Foster's subsequent employment by Su and Datamost.

### B. The Motion to Disqualify Berne S. Broadbent

Su and Datamost have brought a similar motion to disqualify Wang's attorney, Berne S. Broadbent. That motion is based on Broadbent's previous role as a mediator in the

---

**3.** It is even conceivable that a potential litigant could strategically disqualify those attorneys perceived to be the most valuable or likely choices for the opposition.

**4.** The "Wasatch Front" borders the Wasatch mountain range and comprises a roughly ninety mile corridor running from Ogden to Provo with Salt Lake City as its hub. A substantial majority of the population of the State of Utah lives in this narrow region, and most of its attorneys practice here as well. The nearest population centers of any greater size are Denver and Phoenix, each of which is several hundred miles distant.

**5.** This may become particularly necessary when dealing with persons who are unfamiliar with legal proceedings. Individuals and organizations that are more accustomed to dealing with lawyers, on the other hand, will more likely understand the importance of avoiding disclosures of sensitive information during the initial interview. Attorneys should also foresee the possibility of being called upon by the opponent of the potential client. If they desire to keep that option open, then they should take greater care to prevent an atmosphere of confidentiality from arising.

Micromath litigation. With respect to the appropriate rule governing mediators, this case is one of first impression. In making their arguments on this issue, both parties have cited to the *Utah Prof. Conduct Rules*, Rule 1.12(a). That provision states that "a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer, arbitrator or law clerk to such a person, unless all parties to the proceeding consent after disclosure." Su also cites to Nancy H. Rogers & Craig A. McEwen, *Mediation: Law, Policy, Practice* (2d Ed., 1994), and its proposed code of ethics for mediators, which provides that "[w]ithout the consent of all parties, a mediator shall not subsequently establish a professional relationship with one of the parties in a related matter." *Id.* App. D, at 3. In substance, this proposal is analogous to Model Rule 1.9's proscription of subsequent employment on a "substantially related matter," or in the case of the more specific *Utah Prof.Conduct Rules*, Rule 1.9, "substantially factually related matter."

Thus, Rules 1.9 and 1.12 promulgate a significant distinction in the scope of prohibited subsequent representation. This distinction becomes important in this case because the Micromath litigation mediated by Broadbent and the present lawsuit possess a common factual nexus, but are distinct legal disputes. With respect to "matter" as that term is employed by Rule 1.12, there is virtually no case law or other commentary. However, Rule 1.11 contains substantially the same provision as Rule 1.12,[6] and, "as used in [Rule 1.11], the term 'matter' includes ... [a]ny judicial or other proceeding, application, request for ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." *Utah Prof.Conduct Rules*, Rule 1.11(d). Further commentary has observed that

> The same lawsuit or litigation is the same matter. The same issue of fact involving the same parties and the same situation or conduct is the same matter.... [T]he same "matter" is not involved [when] ... there is lacking the discrete, identifiable transaction of conduct involving a particular situation and specific parties.

*Securities Investor Protection Corp. v. Vigman*, 587 F.Supp. 1358, 1365 (C.D.Cal.1984) (quoting ABA Formal Op. 342 (Nov. 24, 1975), 62 A.B.A. J. 517, 519 (1976)). *See Flego v. Philips, Appel & Walden, Inc.*, 514 F.Supp. 1178, 1182 (D.N.J.1981); *International Union, UAW v. National Caucus of Labor Comm.*, 466 F.Supp. 564, 568 (S.D.N.Y.1979); *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 34 (D.D.C.1984). *But see General Motors Corp. v. City of New York*, 501 F.2d 639, 649–51 (2d Cir.1974) (holding legal dispute occurring fourteen years prior to subsequent case involving similar fact pattern was same "matter" for purposes of disciplinary rules).

A "substantially factually related matter," on the other hand, is not defined by any particular, discrete legal proceeding. By its terms, it includes aspects of past controversies which are similar, but not necessarily identical, to those encompassed within a present dispute. So long as there are substantial factual threads connecting the two matters, the criteria of Rule 1.9 are met.[7]

---

**6.** Rule 1.11 applies to government employees who move into private practice. The proscription against subsequent representation of a person "in connection with a matter in which the lawyer participated personally and substantially" (as either a public officer under 1.11(a), or as an adjudicative officer under 1.12(a)) flows from the same public policy imperative of preventing the abuse of public office or appointment. Hence, there is no reason to interpret the meaning of "matter" any differently under Rule 1.12. *See* Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* § 1.12:101 (2d ed. 1994).

**7.** In commenting upon the *Utah Prof.Conduct Rules*, Rule 1.9, the Tenth Circuit has observed that Utah's

> variation from the ABA model code [appears] to be a codification of our existing definition of substantiality by focusing on the factual nexus between the prior and the current representations rather than a narrower identity of legal issues. Substantial factual relation should not be read to require attorneys to have worked on exactly the same matter for both sides of the dispute before they are disqualified.

*SLC Ltd. V v. Bradford Group West, Inc.*, 999 F.2d 464, 467 (10th Cir.1993).

For the most part, [this difference] is due to the different purposes served by each rule. The purpose of rule 1.9 is to assure that the confidentiality and loyalty owed to the client is not compromised.... The purpose of [R]ule 1.11 is to prevent a lawyer from exploiting public office for the advantage of a private client.

*Kosby v. Commissioner,* 64 T.C.M. (CCH) 733, 1992 WL 221167, at *4 (1992).

In this case the lawsuit between Su and Wang is legally distinct from the earlier Micromath litigation because it involves a separate dispute between differing parties, and thereby "lack[s] the discrete, identifiable transaction of conduct involving a particular situation and specific parties." Thus, it is not the same "matter" as that term is understood in Rule 1.12 or 1.11.

The present litigation *is*, however, "substantially factually related" to the Micromath litigation. Poly Software accuses Su and Datamost of impermissibly copying source code and handbook information from the PSI–Plot program. Micromath accused Wang and Su of pirating source code and handbook information to formulate an earlier version of the very same program. The complaints filed in the two cases are virtually identical in many respects, at times employing precisely the same phrasing. Moreover, as a mediator in the Micromath litigation, Broadbent examined in detail the disputed source code and elicited frank discussions in private caucus with Wang and Su as to which of them might be responsible for alleged illegal copying. Therefore, the determinative question on the issue of the ethical status of Broadbent's current representation of Poly Software is whether mediators should be governed by a same "matter" standard similar to that enunciated in Rule 1.12 and 1.11, or by a "substantially factually related" standard similar to that employed by Rule 1.9.

Preliminary to answering that question a brief discussion of the definition of "mediator," is necessary. For the purposes of this opinion, a mediator is an attorney who agrees to assist parties in settling a legal dispute, and in the course of assisting those parties undertakes a confidential relationship with them.[8] Such mediation may often occur in the context of a court-supervised Alternative Dispute Resolution ("ADR") program.[9] *See generally, United States District Court: District of Utah ADR Program Manual* § III [hereinafter *"Utah District Court ADR Manual"*]. "Mediator" in this particular context does not apply to circumstances already covered by the *Utah Prof.Conduct Rules,* Rule 2.2 where attorneys take on the role of intermediary between two or more clients with potentially conflicting interests. Rather, it applies to situations where litigation has already commenced, the parties subsequently agree to suspend their litigation, and also agree to the appointment of an attorney to facilitate settlement. The attorney who thus serves as mediator is a neutral individual who confers with each party in private caucus, learning what results are acceptable to each of them and assessing in confidence the strengths and weaknesses of their cases. The mediator also meets with all parties together to facilitate settlement of the case. In this regard, mediation may well be the most valuable ADR option. "Unlike the litigation and arbitration processes, mediation does not necessarily cast the parties in an adversarial relationship. Nor do parties emerge from the mediation process as clearly

8. The court's earlier opinion, withdrawn and replaced by this order and opinion, referred only to court-appointed mediators because the facts presented did not clearly reveal the specific arrangements for Broadbent's mediation of the Micromath dispute. Nevertheless, the essential rationale behind the disqualification of Mr. Broadbent remained unaffected by the court's error in construing the facts. That rationale relates to the establishment of a confidential relationship during the mediation process.

9. ADR is becoming an increasingly important aspect of court administration. In Utah, both State and Federal courts are vigorously pursuing alternatives to the highly expensive and time-consuming course of traditional litigation. Common ADR options include mediation and binding or non-binding arbitration. Because ADR programs may vary dramatically from jurisdiction to jurisdiction, and are evolving rapidly to meet the needs of litigants and courts, the applicability of ethical rules (including the one formulated by this opinion) will likely vary as well.

defined winners and losers." [10] *Utah District Court ADR Manual* I–11.

These characteristics of mediation demonstrate that it differs significantly from more formal adversarial proceedings at which an adjudicative officer presides. Most importantly, the mediator is not merely charged with being impartial, but with receiving and preserving confidences in much the same manner as the client's attorney. In fact, the success of mediation depends largely on the willingness of the parties to freely disclose their intentions, desires, and the strengths and weaknesses of their case; and upon the ability of the mediator to maintain a neutral position while carefully preserving the confidences that have been revealed. The *Utah District Court ADR Manual,* for instance, encourages the parties to disclose to the mediator (in strict confidence) "[a]ll critical information, whether favorable or unfavorable to the party's position," and recommends that mediators "advise the parties and their attorneys that it is neither helpful nor productive to withhold information with the intent of gaining some tactical advantage." *See id.* at III–3 to –4.

Adversarial proceedings, on the other hand, are characterized by vigorous attempts to maintain confidences. Attorneys who have received such confidential information are under a strict duty to avoid, without the consent of the client, any disclosures of that information. And because adjudicators do not occupy a relationship of confidence and trust with the parties akin to that occupied by the attorneys, they do not, for the most part, have access to those confidences.[11] Thus, although mediators function in some ways as neutral coordinators of dispute resolution, they also assume the role of a confidant, and it is that aspect of their role that distinguishes them from adjudicators.

 As a result, the appropriate ethical rule for mediators differs somewhat from the text of the *Utah Prof.Conduct Rules,* Rule 1.12. Where a mediator has received confidential information in the course of mediation, that mediator should not thereafter represent anyone in connection with the same or a substantially factually related matter unless all parties to the mediation proceeding consent after disclosure. This rule also takes into account some important policy considerations. If parties to mediation know that their mediator could someday be an attorney on the opposing side in a substantially related matter, they will be discouraged from freely disclosing their position in the mediation, which may severely diminish the opportunity for settlement. If, on the other hand, the disqualification net is thrown too wide, attorneys will be discouraged from becoming mediators. The "substantially factually related" standard best balances those two interests. It encourages parties to freely disclose their positions during mediation by assuring them that the specific information disclosed will not be used against them at a later time. It also limits disqualification to subsequent situations where there is a substantial factual nexus with the previously mediated dispute. Applying the "substantially factually related" standard to the present motion, it is evident that Broadbent received confidential information in the course of the Micromath dispute. It is also undisputed that Su and Datamost did not consent to his subsequent representation of Wang in a substantially factually related lawsuit. Therefore, his current representation constitutes a violation of the rule established by this opinion.

Nevertheless, because this is a case of first impression, the court wishes to make clear that in one respect this violation assumes a dramatically different posture than an infraction of a more clearly established rule. Giv-

---

**10.** Because of this, mediation is the one option which is most likely to preserve an ongoing business relationship that might otherwise break down during a more acrimonious adversarial proceeding. *Utah District Court ADR Manual* I–11. Also, mediation is generally the least expensive and quickest ADR option for resolving a dispute. *Id.* at I–3.

**11.** This factor may have as much or more to do with the general prohibition on ex parte communications—a prohibition that is primarily concerned with preventing a party from gaining an advantage through secret communications to a decision maker. Nevertheless, the end result is that an adjudicative officer is rarely privy to any information that is not also revealed to the opposing party.

en the paucity of literature on the issue and the tendency of many commentators to lump all ADR methods under the same ethical rubric, an attorney could have understandably selected the "same matter" standard of the *Utah Prof.Conduct Rules*, Rule 1.12, and thereby reasonably assumed that no violation would occur. Thus, imposition of sanctions or criticism of Mr. Broadbent's professional reputation is unwarranted in this case.

In any event, a finding that a violation has occurred does not necessarily end the inquiry. "The sanction of disqualification of counsel in litigation situations should be measured by the facts of each particular case as they bear upon the impact of counsel's conduct upon the trial.... The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit" *Parkinson v. Phonex Corp.*, 857 F.Supp. 1474, 1476 (D.Utah 1994).[12] In this case, Broadbent received a significant amount of confidential information during the mediation of the Micromath litigation. In particular, he was present while Wang and Su conducted heated conversations on the topic of which of them might be responsible for the copying alleged by Micromath. Poly Software argues that, because Wang was present whenever Su revealed anything to Broadbent, Poly Software does not gain access, by employing Broadbent in the present litigation, to any confidential information that it does not already possess. However, this argument ignores the fact that Broadbent's professional expertise afforded him a perspective on the legal significance of the confidences that Wang himself could not possibly obtain or communicate to new counsel. In short his role as a mediator with experience in intellectual property litigation gives him an unfair advantage as an attorney in the present case. Moreover, given the posture of this case, the disqualification of Broadbent must be imputed to the other members of his small firm. *See Utah Prof.Conduct Rules*, Rule 1.10(a).[13]

---

12. *Parkinson* also suggested a number of factors to be considered in determining whether the lawsuit has been "tainted". Proposed factors included egregiousness of the violation, degree of prejudice resulting from the violation, extent of diminution of effectiveness of counsel, and equitable considerations such as hardship in obtaining new counsel. 857 F.Supp. at 1476–77. While elements such as egregiousness and prejudice will likely always be relevant, other considerations will vary from case to case, depending on the individual circumstances and the policies underlying the particular ethical rule at issue. In this case for instance, no one is claiming that an attorney's current effectiveness has been diminished by a prior association. Rather, Su is asserting that Broadbent's prior experience gives him an unfair advantage in the present litigation. Moreover, as already noted, this case presents some unique and important policy considerations relating to the effectiveness and fairness of mediation.

13. Once again, because this case does not fit within any previously established ethical rule, the scope of imputed disqualification must be inferred from the present rules. Rule 1.10(a) states: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2." This enumerated list primarily encompasses those provisions relating to reception of confidential information. Because mediators are disqualified on that basis as well, Rule 1.10(a) likewise applies to them.