**CLARK CAPITAL MANAGEMENT GROUP, INC., Plaintiff,**

v.

**ANNUITY INVESTORS LIFE INSURANCE COMPANY, Defendant.**

**Civil Action No. 00–CV–1959.**

United States District Court, E.D. Pennsylvania.

July 6, 2001.

John P. Donohue, Jr., Steven L. Friedman, Eric H. Vance, Camille M. Miller, Brian J. Urban, Philadelphia, PA, for plaintiff.

Wayne A. Graver, Thomas Finarelli, Douglas Frechette, James A. Mitchell, Philadelphia, PA, for defendant.

Elizabeth Fox, Gerald Chaplin, for movant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Defendant Annuity Investors Life Insurance Co. ("Annuity") moves for the disqualification of Stephen L. Friedman ("Friedman") and the firm Dilworth Paxson LLP ("Dilworth"), as co-counsel for plaintiff Clark Capital Management Group ("Clark Capital"). Friedman has submitted an opposition to this motion. I will deny the motion for disqualification.

## I. Factual Background

On April 14, 2000, Clark Capital filed a complaint against Annuity alleging trademark infringement. Attorneys with the firm of Woodcock Washburn Kurtz Mackiewicz & Norris LLP have represented Clark Capital from day one of this case. In the fall of 2000, Annuity retained Donald E. Frechette with the firm of Edwards & Angell LLP.[1]

Acting on Annuity's behalf, in the Fall of 2000, Frechette contacted by telephone Thomas S. Biemer ("Biemer"), a partner at Dilworth, to inquire into Biemer's interest and availability to be retained as co-counsel for Annuity in the present action. Frechette submitted two sworn affidavits describing this communication.[2] Frechette asserts in his first sworn affidavit that he spoke with Biemer by telephone on three occasions. He states that they first spoke on October 26, 2000 for approximately ten minutes. Frechette asserts that, during this conversation, he discussed with Biemer "the background facts of this case, the capabilities of opposing counsel, Mr. Biemer's firm's experience and familiarity with opposing counsel and the trial judge, the nature of [Annuity's] defenses, the relative

---

1. John P. Gruber, Esq. ("Gruber"), vice president of Annuity, submitted an affidavit asserting that he first contacted Frechette in connection with this action on October 16, 2000 to inquire into his availability to serve as lead trial counsel for Annuity. *See* Annuity's reply brief in support of the motion for disqualification, Ex. B. Gruber further asserts that, from that day forward, Frechette was authorized to act on behalf of Annuity. Frechette was for-

mally retained in this matter on November 2, 2000.

2. Throughout this opinion, I will cite Frechette's first sworn affidavit, dated June 18th, 2001, attached to Annuity's motion as Exhibit A, as "Frechette 1st Aff." I will cite Frechette's second sworn affidavit, dated June 22, 2001, attached to Annuity's reply brief as Exhibit A, as "Frechette 2d Aff."

merits of each party's case, and potential weaknesses in plaintiff's case." Frechette 1st Aff. ¶ 6. Frechette further states that he described how the case had been handled to date.

According to Frechette, he again spoke with Biemer by telephone on November 6, 2000, for approximately ten to fifteen minutes. He states that, in this conversation, Frechette provided Biemer with additional information relating to specific aspects of the case and Annuity's view of the strengths and weaknesses of these aspects. Frechette also recalls that they discussed one legal theory that might be employed in Annuity's defense. Frechette asserts that he spoke with Biemer for a third time on November 6, 2000, for three to four minutes about a matter of procedure and timing. Finally, Frechette asserts that he believed that any confidential information about the case, disclosed to Biemer during these several conversations, would be kept confidential.

Biemer submitted a sworn affidavit in response to Frechette's affidavit. Biemer states that he recalls the first two conversations described in Frechette's affidavit, but not the third conversation. Biemer agrees that the two attorneys discussed the nature of the case, plaintiff's counsel, and the court. He asserts, however, that he has no recollection that any confidential information was disclosed by Frechette. Biemer recalls only that Frechette informed him that Annuity was claiming the "usual affirmative defenses," which had already been pled and of public record. Biemer Aff. ¶ 8. Biemer states in his affidavit that he has no recollection of any discussion of Annuity's perception of strengths and weaknesses in the case or of possible defense strategy.

On June 12, 2001, when contacted by the court during a conference in this case in which Annuity first raised an objection to Friedman's participation in the case, Biemer stated over the telephone:

> I don't recall, specifically, discussing the merits of the case, other than that it involved something that was named Navigator, it was a trademark case.... I don't remember specifically discussing any affirmative defenses, but it's possible we did, I just don't recall, it was a while ago.

Transcript of Proceedings Before the Honorable Anita B. Brody on June 12, 2001 (docket entry # 95) ("6/12/01 Tr.") at 11.

In addition, Biemer's affidavit states that he told Frechette during the first conversation that, before Dilworth could agree to represent Annuity, he would have to run a conflict check. Biemer avers that it was not until the second conversation that Frechette asked Biemer to run a conflict check, "if Dilworth was interested in serving as local counsel." Biemer Aff. ¶ 12. Biemer also states that Frechette asked him to send Frechette any relevant information materials about Dilworth. Following the November 6, 2000 telephone conversation, Biemer had no further communications with Frechette about this case, and an offer of retention was never made.

Frechette's second affidavit was submitted in response to Biemer's affidavit. In this affidavit, Frechette asserts that the issue of a conflict search was not discussed during the telephone conversations. He states that Biemer mentioned a conflict check for the first time in a letter dated November 7, 2000. Frechette further states:

> I certainly assumed that Attorney Biemer would not undertake a matter without performing a conflict check and, accordingly, felt no need to specifically inquire as to the matter further.

Frechette 2d Aff. ¶ 10.

Annuity never retained Dilworth. On June 11, 2001, Friedman, a Dilworth attor-

ney, entered an appearance on behalf of Clark Capital.

## II. Discussion

Annuity asserts that these several telephone conversations between Frechette and Biemer rose to the level of an attorney-client relationship between Annuity and Biemer, such that Friedman is in violation of the Rules of Professional Conduct. This District has adopted the Pennsylvania Rules of Professional Conduct. *See* Loc.R.Civ. P. 83.6 R. IV. These Rules provide that:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) Represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation.

Rule of Professional Conduct 1.9.

This prohibition disqualifies the lawyer's entire firm.

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8, 1.9 or 2.2.

Rule of Professional Conduct 1.10. Annuity argues that, because Frechette's telephone conversations with Biemer rose to the level of an attorney-client relationship, Annuity is a "former client" of Dilworth and, therefore, Friedman may not now represent the opposing party in this same matter.

■■■ To determine whether Friedman is in violation of these ethical rules, I must decide whether Annuity is a "former client" of Dilworth. In other words, did there previously exist an attorney-client relationship between Annuity and Dilworth.[3] "An attorney-client relationship is one of agency and arises only when the parties have given their consent, either express or implied, to its formation." *Committee on Professional Ethics and Grievances of the Virgin Islands Bar Assoc. v. Johnson,* 447 F.2d 169, 174 (3d Cir.1971). Both parties agree that no formal attorney-client relationship existed between Annuity and Dilworth. "Where no express relationship exists, the intent to create an attorney-client relationship can be implied from the conduct of the parties." *Hunter v. Jacoby & Meyers Law Offices,* 1996 WL 257348 *3 (E.D.Pa.1996) (citing *Mursau Corp. v. Florida Penn Oil & Gas, Inc.,* 638 F.Supp. 259, 262 (W.D.Pa. 1986)). *See also Ferranti International v. Clark,* 767 F.Supp. 670, 670 (E.D.Pa.1991) ("attorney-client relationship does not arise only in agency manner, but also where layperson submits confidential information to lawyer with reasonable belief that latter is former's attorney") (citing *Westinghouse Electric Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978)). The issue is whether an implied attorney-client relationship arose during the course of the several telephone conversations between Frechette and Biemer. Annuity asserts that an implied attorney-client relationship between Annuity and Biemer arose because, acting on Annuity's behalf, Frechette: (1) disclosed confidential information to Biem-

---

**3.** The standard for determining whether Rule 1.9 has been violated is the "substantial relationship" test. *See Rickards v. CertainTeed Corp.,* 1995 WL 120231, *3 (E.D.Pa.1995) (ci-

tations omitted). There is no question that if an attorney-client relationship existed between Annuity and Biemer, the matter is the same, namely this case.

er, (2) with a reasonable belief that Biemer was acting in the capacity of attorney for Annuity throughout the course of the communication.

Based on the facts presented, I find that the several brief telephone conversations between Frechette and Biemer did not give rise to an implied attorney-client relationship between Annuity and Dilworth. Frechette asserts in his first sworn affidavit that he disclosed to Biemer confidential information related to Annuity's defenses and legal theories of the case. Biemer admits that it is possible such disclosures were made. However, Biemer contends that he has no recollection of disclosure of any confidential information.

Setting aside for the moment the question of whether confidential information was in fact disclosed, it is clear from the facts presented that Frechette could not have held a reasonable belief that Biemer was acting as an attorney for Annuity during the course of the communication. Frechette initiated the communication with Biemer to inquire into Biemer's interest and availability to be retained as co-counsel for Annuity in the present action. At no time during the communication did Frechette offer to retain Biemer as co-counsel and at no time during the communication did Biemer consent to representation of Annuity. To the contrary, it was evident from Frechette's request that Biemer send informational materials about the firm, that Frechette had not yet decided whether to retain Biemer as co-counsel. Frechette was reserving the right to make a decision after learning more about the firm. *See B.F. Goodrich Co. v. Formosa Plastics Corp.*, 638 F.Supp. 1050, 1052 (S.D.Texas 1986) (finding no implied attorney-client relationship where it was clear during an initial interview that the purported client was reserving the right to

make a decision as to whether to retain the lawyer).

■ Furthermore, it is evident that Frechette never conceived that Biemer was acting as Annuity's attorney during the communication, because Biemer had not yet run a conflict check. Frechette contests Biemer's assertion that Biemer raised the need to run a conflict check before consenting to representation during the telephone conversations. However, even if Biemer did not raise the need to run a conflict check, Frechette, equally knowledgeable of the ethical rules, was well aware that Biemer would not consent to representation of Annuity before running a conflict check. Frechette explicitly stated in his second sworn affidavit:

> I certainly assumed that Attorney Biemer would not undertake a matter without performing a conflict check and, accordingly, felt no need to specifically inquire as to the matter further.

Frechette 2d Aff. ¶ 9. When Frechette first contacted Biemer on October 26, 2000, the telephone conversation during which Frechette asserts that he first disclosed confidential information to Biemer, Frechette could not have reasonably assumed that Biemer had already run a conflict check. By Frechette's own admission, therefore, it was unreasonable for Frechette to assume during that conversation that Biemer had consented to representation of Annuity. The duty to maintain confidences does not arise absent an attorney-client relationship. It follows that Frechette unreasonably assumed that Biemer would maintain the confidentiality of any information Frechette disclosed, despite Frechette's awareness that no attorney-client relationship had been established. Annuity is not a former client of Biemer and neither Friedman nor Dilworth are in violation of Pennsylvania Rule of Professional Conduct 1.9.

■ I must still address the concern that confidential information about the case may have been disclosed by Frechette, which potentially could be used to the detriment of Annuity if Friedman is permitted to serve as counsel to Clark Capital. "One of the inherent powers of the federal court is the admission and discipline of attorneys practicing before it." *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 160 (3d Cir.1984). Therefore, when there is a risk that the underlying litigation may be tainted by participation of counsel, the court has the power to fashion an appropriate remedy.[4]

In the event that confidential information was disclosed, I find that disqualification of Dilworth is an inappropriate remedy under the facts of this case, but rather that screening Biemer from the case will appropriately balance the interests of all parties. Biemer asserts that he has no recollection that any confidential information was disclosed to him about this case. Therefore, even if he did receive confidential information about the case, Biemer is not capable of relaying anything of substance to other Dilworth attorneys. Biemer also asserts in his affidavit that he has been screened from the matter from the moment Clark Capital contacted the firm. He states:

> On approximately June 7, 2001, I learned that Dilworth was contacted by Clark [Capital] and asked to enter its appearance as counsel for Clark [Capital]. When I learned this, I relayed to one of the heads of Dilworth's litigation department, James Rogers, Esquire, the substance of my conversations with Mr. Frechette as outlined in this Affidavit. While we agreed that there was no conflict given the limited nature of these conversations, in an abundance of caution, it was decided that I would not be involved in any respect with this case and would not have any contact regarding the substance of the case with anyone working on the case for Dilworth. With the exception of my participation in the Conference Call before the Court on June 11, 2001 and the preparation of this Affidavit, I have not had any involvement in this case.

---

**4.** Even when an attorney has violated an ethical rule, "disqualification never is automatic." *U.S. v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980). The court retains discretion to fashion an appropriate remedy. *Id.* The Third Circuit has stated:

> [T]he court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.

*Id.* The Third Circuit has left open the question of whether screening the attorney implicating a conflict from the case may serve as an appropriate alternative to disqualification. *See id.* at 1204 (declining to consider a screening mechanism as an alternative to disqualification because the non-moving party had not adequately presented the issue to the court). In this case, Friedman asserts that Dilworth can effectively screen Biemer from any involvement in the case. Other courts in this District have adopted screening of a single attorney as a remedy in situations of a potential conflict, where the facts do not call for disqualification of the entire firm. *See, e.g., INA Underwriters Insurance Co. v. Rubin,* 635 F.Supp. 1 (E.D.Pa.1983).

Annuity argues that screening is an available remedy only where "the infected lawyer" has arrived from outside the firm. Defendant's Motion at 5. *INA Underwriters Insurance* refutes this argument. In *INA Underwriters Insurance,* the attorney who was screened was not an incoming attorney from outside the firm, but rather had obtained information substantially related to the pending litigation during an initial attorney-client consultation before a conflict check had been done. *See* 635 F.Supp. at *2.

Aff. Biemer ¶ 17. Friedman substantiated Biemer's assertion on the record at the June 12, 2001 conference in this matter, stating that Biemer will have nothing to do with this case and that Friedman has had no conversations with Biemer about the case other than to inform Friedman of the brief communication between Biemer and Frechette. *See* 7/12/01 Tr. at 4, 13.

I am not persuaded by Annuity's argument that disqualification of Dilworth is necessary to protect against the "mere appearance of an impropriety" and to maintain the integrity of the legal profession. Defendant's Motion at 7–8. While the ethical rules are designed, in part, to encourage attorney-client candor, attorneys that have already been retained in a matter and who are well versed in the perimeters of the attorney-client relationship, should be encouraged to take care with their client's confidences in the course of preliminary inquiries with potential co-counsel in another firm. Such inquiries should not form the basis for disqualification of an entire firm in situations, such as this, where it was clear to both parties that an attorney-client relationship was never established. Allowing Friedman to be retained by Clark Capital in this matter requires effective screening of only a single attorney out of approximately 100 attorneys at Dilworth. In light of this, the fact that Annuity is not a former client of Dilworth, and the minimal likelihood that Dilworth's involvement in this case would taint the pending litigation, I will deny Annuity's motion to disqualify Friedman and Dilworth. I will require that Dilworth continue to screen Biemer from any involvement in this case.

**AND NOW,** this 6th day of July, 2001 it is **ORDERED** that:

(1) Defendant's motion for disqualification of counsel (docket entry # 86) is **DENIED**;

(2) Thomas S. Biemer, Esq. shall be screened from any involvement on this matter; and

(3) This motion will not be heard at the conference to be held in this matter on July 17, 2001.