[No. S058639. July 27, 1999.]

THE PEOPLE ex rel. DEPARTMENT OF CORPORATIONS, Plaintiff, v. SPEEDEE OIL CHANGE SYSTEMS, INC., et al., Defendants; GARY BURCH et al., Interveners and Respondents; MOBIL OIL CORPORATION, Movant and Appellant.

1136

COUNSEL

Horvitz & Levy, Barry R. Levy, Lisa Perochet, Sandra J. Smith, Jon B. Eisenberg; Cohon & Gardner, Steven H. Gardner and Jeffrey M. Cohon for Movant and Appellant.

Law Offices of Geordan Goebel, Geordan Goebel; Shapiro, Rosenfeld & Close, Mitchell S. Shapiro, Douglas L. Carden and Rhonda H. Mehlman for Interveners and Respondents.

Diane C. Yu, Marie M. Moffat, Robert A. Hawley and Teri L. Nelson for the State Bar of California as Amicus Curiae.

Rogers, Joseph, O'Donnell & Quinn, Pamela Phillips and Sean M. SeLegue as Amici Curiae.

**OPINION**

**CHIN, J.**—When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm. (See *Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 283 [36 Cal.Rptr.2d 537, 885 P.2d 950]. (*Flatt*).) This rule safeguards clients' legitimate expectations that their attorneys will protect client confidences. (*Id.* at pp. 283-284.) Here, we decide whether the same rule should apply when a party unknowingly consults an attorney "of counsel" to the law firm representing the party's adversary in the subject of the consultation.

Mobil Oil Corporation (Mobil) consulted Attorney Eliot G. Disner, who was of counsel to Shapiro, Rosenfeld & Close (the Shapiro firm). Mobil was a defendant in a complaint in intervention by respondents Gary and Annette Burch et al., Southern California franchisees of SpeeDee Oil Change Systems, Inc. (SpeeDee Oil). While Mobil was consulting Disner, respondents associated the Shapiro firm as counsel of record in their action against Mobil. Mobil moved to disqualify the Shapiro firm upon learning of its association, arguing that Disner had a conflict of interest that required its vicarious disqualification.

The trial court denied Mobil's motion. The court found no basis for a presumption that Disner disclosed confidences to the Shapiro firm, notwithstanding Disner's relationship with the firm. The Court of Appeal affirmed, concluding that substantial evidence existed for implied findings that Disner's relationship with the Shapiro firm was not "close, personal, continuous, and regular" and that Disner conveyed no confidential information to the firm. We granted Mobil's petition for review.

We adopt the prevailing rule concerning "of counsel" conflicts of interest and reverse the judgment of the Court of Appeal. For attorneys in the same firm to represent adverse parties in the same litigation is so patently improper that the rule of disqualification is a per se or "automatic" one. (See *Flatt, supra,* 9 Cal.4th at p. 284, fn. 3 and accompanying text.) Conflicting representations that would disqualify all of a law firm's attorneys are not more acceptable when an attorney of counsel to the firm creates the conflict. Clients, and the public, should expect confidentiality and loyalty from attorneys who effectively declare they practice law in a close, personal, and

continuing association. These legitimate expectations would be frustrated if a firm could represent one party in litigation while an attorney of counsel to the firm represented an adversary in the same case.

## FACTUAL AND PROCEDURAL BACKGROUND

This case began when the Attorney General sued SpeeDee Oil and others on behalf of the Department of Corporations, alleging violations of the Franchise Investment Law (Corp. Code, § 31000 et seq.). Numerous SpeeDee Oil franchisees intervened in the action, including respondents. The franchisees brought Mobil into the action as a defendant in intervention.

Attorney Geordan Goebel, a sole practitioner, had represented respondents since 1994. Because of the action's scope, he decided to associate a law firm as attorneys of record to help him prosecute respondents' claims. Goebel approached the Shapiro firm because of its expertise in franchise law and met with Mitchell Shapiro on June 22, 1996. Around this time, the Shapiro firm's letterhead listed 14 attorneys' names, with 4 more attorneys listed as of counsel to the firm, all at the same office address. Among those identified as of counsel to the firm was Eliot G. Disner, an attorney who had substantial experience with antitrust issues.

Over the next few weeks, Goebel developed a "good working relationship" with the Shapiro firm. On July 10, he signed a notice associating the Shapiro firm as counsel of record for respondents. Mitchell Shapiro signed the notice for the Shapiro firm on July 12. The notice of association of counsel was served by mail on July 15, 1996, and filed with the court the following day.

The law firm of Cohon and Gardner represented Mobil in the SpeeDee Oil action. Early in July 1996, Jeffrey Cohon, an associate with Cohon and Gardner, spoke to Attorney Steven Hecht about contacting Disner concerning the case. Hecht knew both Cohon and Disner personally. To facilitate an initial check for conflicts, Cohon told Hecht the name of the case and the principal attorneys involved. Hecht spoke with Disner later that week. Hecht asked Disner if he knew of the case involving SpeeDee Oil and Mobil. When Disner said he did not, Hecht asked him to call Jeffrey Cohon.

Disner and Cohon spoke by telephone on July 11 or 12. When Cohon returned Disner's call, the receptionist answered the telephone, "Shapiro, Rosenfeld and Close." Cohon's call was put through to Disner, who confirmed he had spoken with Hecht and had not heard of the SpeeDee Oil case or the attorneys involved in it. In a conversation Cohon believed was

confidential, he and Disner discussed the case's substantive allegations, its procedural status, and Mobil's theories. They arranged a meeting for July 16.

On July 16, 1996, Cohon and Gardner Attorneys Bennett Cohon, Jeffrey Cohon, and Steven Gardner met with Disner to discuss his assisting with Mobil's representation. They spoke for one to two hours over lunch. Gardner received a copy of Disner's resume, which—like Disner's business card—prominently featured the Shapiro firm's name and address.

Gardner briefed Disner on the case and Mobil's position. The matters disclosed to Disner included "the background of the case, Mobil's theories in the case, Mobil's discovery strategy and an analysis of the procedural and substantive issues which had arisen to date and [were] likely to arise in the future, the state of the case, experts, and consultants, and specific factual issues." The Cohon and Gardner attorneys considered the information disclosed to Disner to be confidential and attorney work product.

According to Gardner's and Jeffrey Cohon's declarations, when the meeting ended, Gardner and Disner agreed to prepare a document formally retaining Disner as a consultant. Disner did not directly contradict the Cohon and Gardner attorneys' statements. His declaration stated that at the end of the meeting, the Cohon and Gardner attorneys "expressed interest" in using his services, although they did not know "exactly" how they intended to do so.

Gardner further declared that Disner agreed to check some statutes and case law that applied to a few of the issues they discussed. He stated that he and Disner spoke again later in the afternoon of July 16, and Disner conveyed the results of his review of those issues. No declaration contradicted Gardner's account of those discussions.

The next day, July 17, Gardner received the notice of the Shapiro firm's association as counsel for respondents. Consequently, that same day the Cohon and Gardner firm informed Disner that Mobil would not be using his services. Gardner immediately faxed a letter to the Shapiro firm, Disner, and Goebel, stating that Mobil objected to the Shapiro firm's participation in the case on behalf of respondents. Gardner's letter asserted the Shapiro firm had an ethical conflict because of Cohon and Gardner's conversations with and disclosures to Disner concerning the case. The Shapiro firm responded with a letter faxed the next day, contending there was no basis for the firm's disqualification. The response stated that the Shapiro firm had already associated as counsel for respondents when Disner met with the Cohon and Gardner attorneys. The response also stated that Disner was of counsel to the Shapiro firm and not an associate, partner, or shareholder.

Four days later, on July 22, 1996, Mobil filed an ex parte application for an order shortening time for a motion to disqualify the Shapiro firm. Mobil's motion was set for hearing on July 24, 1996. The moving and opposing papers included declarations and exhibits setting out the facts related above. In addition, Disner's declaration stated he had not "discussed the merits of [the SpeeDee Oil] action with any attorney or other employee" of the Shapiro firm. He also said he customarily reviewed possible conflicts of interest with the firm before associating with them on cases. Disner and the Shapiro firm did not discuss a potential conflict in this instance because neither had asked the other to associate for the SpeeDee Oil case. Similarly, Mitchell Shapiro declared that he had "not discussed this action" with Disner and did not know "what was discussed between" Disner and the Cohon and Gardner attorneys.

The Shapiro firm's declarations submitted in opposition to Mobil's motion provided additional details of the firm's relationship with Disner. Disner's declaration stated: "Although I am designated as 'Of Counsel' to SRC [the Shapiro firm], I have a separate law practice from SRC. I have my own clients, whom I bill separately from SRC. I pay rent to SRC for office space. I have my own staff whom I pay for their services. I do not share in any profits of SRC, nor do I incur any liabilities on behalf of SRC. In those few cases (perhaps 3-4 per year) on which I associate with SRC, which is strictly determined on a case-by-case basis, if I use any attorney from SRC to perform services, I pay SRC a percentage of that attorney['s] usual hourly rate for the time spent working on my clients' cases. Similarly, if SRC uses my services on any cases, it pays me a percentage of my usual hourly fee for services rendered."[1]

The trial court denied Mobil's motion to disqualify the Shapiro firm. The court decided the matter based on the written submissions, stating: "[T]here is no basis on which to presume that Eliot Disner, Esq., who is of counsel to [the Shapiro firm], imparted any confidential information to [the firm], as concerns this case. Disner and [the Shapiro firm] were initially unaware of each other's involvement in this case and Disner was not retained by MOBIL nor is he presently involved in this case."

---

[1]Mitchell Shapiro's declaration echoed Disner's description of his relationship with the Shapiro firm. Shapiro stated: "Mr. Disner is considered 'Of Counsel' to SRC [the Shapiro firm], however, he has an entirely separate law practice from SRC. SRC and Mr. Disner each have their own clients, who are billed separately. Mr. Disner rents office space from SRC, but has his own staff. Mr. Disner's staff is not on SRC's payroll. SRC and Mr. Disner do not share in each others' [sic] profits, nor do they share liabilities. SRC and Mr. Disner occasionally associate with each other on specific cases. In those situations, Mr. Disner pays SRC a percentage of the hourly rate of each attorney used. The same agreement applies if SRC uses Mr. Disner's services on particular cases."

The Court of Appeal affirmed the trial court's order, applying an abuse of discretion standard of review. The court viewed the matter as one involving conflicting evidence and inferences on the actual nature of the particular "of counsel" relationship in question: "We agree that *if* [the Shapiro firm] simultaneously represented both Mobil and the [respondents] in this litigation, it would be subject to automatic disqualification. And we assume for purposes of discussion that by performing legal research for Mobil, Mr. Disner represented it. However, the trial court impliedly concluded Mr. Disner practiced law separate and apart from [the Shapiro firm] except on those few annual occasions when Mr. Disner or [the Shapiro firm] associated the other on a particular case. . . . [There] was probative and persuasive evidence of a 'close, personal, continuous, and regular' professional affinity which characterizes the 'of counsel' relationship. . . . However, there was conflicting evidence which indicated there was in reality no 'close, personal, continuous, and regular' relationship . . . . Simply stated, the evidence concerning the relationship was in conflict and the trial judge resolved that dispute in favor of one side. Furthermore, even if a concern for client confidentiality arose on the facts of this case, substantial evidence established Mr. Disner did not impart any confidential information to [the Shapiro firm]. Therefore, we find no abuse of discretion." (Original italics.)

## DISCUSSION

This case requires us to resolve two distinct questions. First, were Disner's contacts and discussions with the Cohon and Gardner attorneys such that he represented Mobil for purposes of a conflict of interest analysis? Second, if so, should any conflict of interest be imputed to the law firm to which he was of counsel so as to require its disqualification? To answer these questions, we first review the principles involved when one party seeks to disqualify its opponent's counsel, beginning with the appropriate standard of appellate review.

### Standard of Review

■ Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. (*Cho v. Superior Court* (1995) 39 Cal.App.4th 113, 119 [45 Cal.Rptr.2d 863]; *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585 [283 Cal.Rptr. 732].) If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. (*Cho v. Superior Court, supra,* 39 Cal.App.4th at p. 119; *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585.)

When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585.) However, the trial court's discretion is limited by the applicable legal principles. (*Ibid.*) Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. (*Cho* v. *Superior Court, supra,* 39 Cal.App.4th at p. 119.) In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585.)

Here, the trial court grounded its ruling on a legal conclusion—that there was no basis to *presume* Disner disclosed confidential information. The facts the trial court mentioned in its ruling were undisputed, including that Disner and the Shapiro firm initially were unaware of each other's involvement, that Mobil did not retain Disner, that Disner was no longer involved in the case, and, most significantly, that Disner was of counsel to the Shapiro firm.

The attorneys' declarations reveal no disputed material facts. Neither Mobil nor its attorneys knew the private details of the business arrangements between Disner and the Shapiro firm. Thus, they could not dispute Disner's and Shapiro's declarations on such matters, absent formal discovery. Although the Shapiro firm presumably had access to Disner and could have disputed Mobil's assertions if inaccurate, the firm's declarations did not contradict the facts Mobil presented concerning the consultation with Disner.

As a result, Mobil based its motion to disqualify the Shapiro firm on undisputed facts concerning the nature of the confidences communicated to Disner and the public aspects of Disner's relationship with the Shapiro firm. Respondents also grounded their opposition to the motion in essentially undisputed matters—the particulars of the private business dealings between Disner and the Shapiro firm and the timing of the firm's association as counsel for respondents.

Thus, in this case, we need not defer to a trial court's resolution of disputed facts and inferences. Instead, we are concerned with the legal significance of the undisputed facts in the record. We therefore review the trial court's exercise of its discretion as a question of law in light of the pertinent legal principles. (See *Cho* v. *Superior Court, supra,* 39 Cal.App.4th at p. 119.)

### *Disqualification Principles*

■ A motion to disqualify a party's counsel may implicate several important interests. Consequently, judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice.

(See *Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 915 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562].) Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion. (See *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 586; *River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1308-1309 [234 Cal.Rptr. 33]; see generally, 1 Hazard & Hodes, The Law of Lawyering (2d ed. 1996 & 1998 supp.) § 1.10:103, pp. 320-322 [discussing interests involved in vicarious disqualification].)[2] Nevertheless, determining whether a conflict of interest requires disqualification involves more than just the interests of the parties.

A trial court's authority to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5); *People* ex rel. *Clancy* v. *Superior Court* (1985) 39 Cal.3d 740, 745 [218 Cal.Rptr. 24, 705 P.2d 347]; *Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 916, fn. 4; *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585.) Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. (*Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 915.) The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. (*Ibid.*; *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 586; *River West, Inc.* v. *Nickel, supra,*

[2]The latter concerns are almost entirely absent in this case. The undisputed evidence showed that Mobil's attorneys sought Disner out of a genuine interest in his services. They were unaware of the Shapiro firm's contacts with Goebel. Nothing indicated that their consultation with Disner was a ploy to deprive respondents of the Shapiro firm's services. Moreover, Mobil objected immediately on learning of the Shapiro firm's involvement in the case. At that point, neither the Shapiro firm nor respondents seemed to have invested substantial amounts of time or resources in their new relationship.

This case is not one where, despite knowing the pertinent facts, a party unreasonably delayed seeking disqualification and so caused its opponent significant prejudice. (See *River West, Inc.* v. *Nickel, supra,* 188 Cal.App.3d at pp. 1311-1313.) There was no basis for concern here that one party, by belatedly moving to disqualify opposing counsel, was attempting to disrupt a case at a critical juncture. Similarly, this case was not one where a party tried to increase an opponent's litigation burdens by seeking disqualification only after the challenged counsel performed a substantial amount of work. Consequently, we do not comment on the relative weight these concerns might deserve in deciding a disqualification motion based on a conflict of interest.

188 Cal.App.3d at pp. 1306-1308; see 1 Hazard & Hodes, The Law of Lawyering, *supra*, § 1.7:101, pp. 223-225 [discussing the assumed function of automatic disqualification rules in maintaining public confidence in the legal system].)

Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring " 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' [Citation.]" (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642].) ■ To this end, a basic obligation of every attorney is "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." (Bus. & Prof. Code, § 6068, subd. (e).)

To protect the confidentiality of the attorney-client relationship, the State Bar Rules of Professional Conduct, rule 3-310 (rule 3-310) prohibits attorneys from accepting, without the client's informed written consent, "employment adverse to the client or former client where, by reason of the representation of the client or former client, the [attorney] has obtained confidential information material to the employment." (Rule 3-310(E); *Flatt*, *supra*, 9 Cal.4th at pp. 283-284; *Western Continental Operating Co.* v. *Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 759 [261 Cal.Rptr. 100].) Where an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation. (*Flatt*, *supra*, 9 Cal.4th at p. 283.) For the same reason, a presumption that an attorney has access to privileged and confidential matters relevant to a subsequent representation extends the attorney's disqualification vicariously to the attorney's entire firm. (*Ibid.*)

A related but distinct fundamental value of our legal system is the attorney's obligation of loyalty. Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process. (See *Santa Clara County Counsel Attys. Assn.* v. *Woodside* (1994) 7 Cal.4th 525, 547-548, fn. 6 [28 Cal.Rptr.2d 617, 869 P.2d 1142] and accompanying text.) The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. (*Flatt*, *supra*, 9 Cal.4th at pp. 282, 285.) The

courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship. (*Ibid.*) Therefore, if an attorney—or more likely a law firm—simultaneously represents clients who have conflicting interests, a more stringent per se rule of disqualification applies. With few exceptions, disqualification follows automatically, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other. (*Id.* at p. 284.)

The most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation. (*Flatt, supra,* 9 Cal.4th at p. 284, fn. 3.) Such patently improper dual representation suggests to the clients—and to the public at large—that the attorney is completely indifferent to the duty of loyalty and the duty to preserve confidences. However, the attorney's actual intention and motives are immaterial, and the rule of automatic disqualification applies. "The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct," but also to keep honest attorneys from having to choose between conflicting duties, or being tempted to reconcile conflicting interests, rather than fully pursuing their clients' rights. (*Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788].) The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another. (*Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 526-527 [50 Cal.Rptr. 592].)

██ Here, any concerns about compromised attorney loyalty must take into account the limited period during which the Shapiro firm represented respondents and Disner was engaged in communications with Mobil's counsel. Mobil effectively ended the risk of divided loyalty by promptly terminating Disner's services. However, the concern for client confidences, like the attorney's duty to preserve those confidences, continues after the attorney's services end. (Cf. *Flatt, supra,* 9 Cal.4th at p. 283.) Therefore, we examine the relationship between Disner and Mobil, conducted through Mobil's counsel, to determine whether Disner should be deemed to have represented Mobil for purposes of a conflict of interest analysis.

*Consultation and Representation*

██ In considering whether an attorney-client relationship has reached a point where the attorney can be subject to disqualification for a conflict of interest, we begin with the relationship's early stages, as noted in *Beery* v. *State Bar* (1987) 43 Cal.3d 802 [239 Cal.Rptr. 121, 739 P.2d 1289]: " 'The fiduciary relationship existing between lawyer and client extends to preliminary consultations by a prospective client with a view to retention of the

lawyer, although actual employment does not result.' (*Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.* (7th Cir. 1978) 580 F.2d 1311, 1319, fn. omitted.) 'When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie.*' (*Perkins* v. *West Coast Lumber Co.* (1900) 129 Cal. 427, 429 [62 P. 57].) 'The absence of an agreement with respect to the fee to be charged does not prevent the relationship from arising.' (*Miller* v. *Metzinger* (1979) 91 Cal.App.3d 31, 39 [154 Cal.Rptr. 22].)" (*Beery* v. *State Bar, supra,* 43 Cal.3d at pp. 811-812; cf. *Flatt, supra,* 9 Cal.4th at pp. 281-282, fn. 1 and accompanying text.)

The primary concern is whether and to what extent the attorney acquired confidential information. (See *Henriksen* v. *Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 113-114 [14 Cal.Rptr.2d 184].) That question is not necessarily answered by the amount of time involved. "Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences." (*Novo Terapeutisk, etc.* v. *Baxter Travenol Lab.* (7th Cir. 1979) 607 F.2d 186, 195.) Consequently, a formal retainer agreement is not required before attorneys acquire fiduciary obligations of loyalty and confidentiality, which begin when attorney-client discussions proceed beyond initial or peripheral contacts. An attorney represents a client—for purposes of a conflict of interest analysis—when the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result. (See *Beery* v. *State Bar, supra,* 43 Cal.3d at p. 812; *Henriksen* v. *Great American Savings & Loan, supra,* 11 Cal.App.4th at pp. 113-114; *Miller* v. *Metzinger* (1979) 91 Cal.App.3d 31, 39-40 [154 Cal.Rptr. 22].)

The cases on which respondents rely do not compel a contrary conclusion. *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556 [20 Cal.Rptr.2d 132] concerned a woman's telephone contact with an attorney, Kenneth Gack, to discuss representation for postdissolution proceedings. Neither of them knew that her ex-husband's attorney had become a partner in Gack's firm after the dissolution judgment was entered. In her 1992 motion to disqualify her ex-husband's attorney, the woman stated she had a 20-minute telephone consultation with Gack in November 1989. She said she had explained her case fully to Gack. She also said that Gack had provided initial impressions and opinions before recommending that she contact someone with family law expertise. For his part, Gack said he had no notes and no recollection of any such conversation. (*Id.* at pp. 560-561.)

The Court of Appeal affirmed the trial court's denial of the motion to disqualify the ex-husband's attorney. In doing so, the court properly focused

on whether the woman established, directly or by reasonable inference, that in the telephone conversation Gack acquired confidences related to the postdissolution proceedings. (*In re Marriage of Zimmerman, supra,* 16 Cal.App.4th at pp. 564-566.) Several factors contributed to the court's conclusion that the woman failed to show Gack acquired confidential information.[3]

As *Zimmerman* stated, if Gack provided any representation at all, "it was clearly of a preliminary and peripheral nature. [Citation.] . . . He performed no work [and instead] referred her to an attorney with 'domestic relations expertise.'" (*In re Marriage of Zimmerman, supra,* 16 Cal.App.4th at pp. 564-565.) Also, while Gack may have offered his initial impression and opinion in response to the woman's "outline" of her case, "he obviously was not called upon to formulate a legal strategy and, by the very limited nature of his contact with [the woman], could not have gained detailed knowledge of the pertinent facts and legal principles. [Citation.]" (*Id.* at p. 564.) Furthermore, the woman's declaration in support of her motion failed to show, or even claim, that she disclosed confidential information to Gack. In that regard, the appellate court noted that the issue for which she consulted Gack in 1989 had little connection with the issues remaining in dispute three years later when she moved for disqualification. (*Id.* at p. 565.) As a result, the court found it unlikely that Gack possessed any material confidential information. (*Ibid.*)

By contrast, as the undisputed facts make evident, the initial discussions between Disner and the Cohon and Gardner attorneys involved substantial amounts of material confidential information. Moreover, Disner did not receive the information about Mobil's case theories, strategy, and analyses from a layperson who might or might not be knowledgeable about which matters were significant. Instead, after receiving the background information on the case, Disner participated in an extended briefing with the attorneys conducting Mobil's defense against respondents' claims. Obviously, communications of that kind are likely to involve an efficient transfer of material confidential information and attorney work product.

---

[3]*Zimmerman* also concluded that other circumstances justified denial of the disqualification motion: "Finally, we observe that . . . [t]o deprive [the ex-husband] of the counsel of his choice at this late stage of the proceedings, where no unfair disadvantage to [the ex-wife] is indicated, would, we believe, cause undue hardship to [the ex-husband] without serving the purpose of the disqualification remedy. [Citations.]" (*In re Marriage of Zimmerman, supra,* 16 Cal.App.4th at p. 565.) As noted earlier, the present case does not require us to consider how delay in seeking relief might affect the decision on a motion to disqualify counsel. (Cf. *River West, Inc.* v. *Nickel, supra,* 188 Cal.App.3d at pp. 1308-1309.)

Respondents also rely on three federal district court decisions to support their claim that Disner and Mobil never had any confidential or attorney-client relationship. However, those decisions did not involve the communication of material confidences and the subsequent provision of legal services as occurred here.

In the first case, *Poly Software Intern., Inc.* v. *Su* (D.Utah 1995) 880 F.Supp. 1487, the parties provided conflicting evidence regarding the initial meeting between the attorney and the potential client. The trial court credited the attorney's account that the meeting (*id.* at p. 1491), which lasted less than 30 minutes, focused primarily on fee schedules and litigation policies, and that the potential client disclosed only that " 'he had a dispute against a former partner, software was involved, and there was some type of prior settlement agreement.' " (*Id.* at p. 1489.) Consequently, the trial court held "that the degree of confidentiality established in the interview was insufficient to preclude [the attorney's] subsequent employment by [the potential client's opponents]." (*Id.* at p. 1491.) The undisputed accounts here show the conversations between Disner and Mobil's attorneys plainly extended much further into confidential matters than did the brief interview in *Poly Software*.[4]

In *INA Underwriters Ins. Co.* v. *Rubin* (E.D.Pa. 1983) 635 F.Supp. 1 (*INA*), an insurance company filed a civil complaint against the defendant. Before the complaint was served, agents of the Federal Bureau of Investigation contacted the defendant concerning their investigation of matters related to the case. The defendant then met with a criminal attorney who, apparently unknown to either of them, was a member of the firm that prepared and filed the civil complaint. During their initial meeting, the attorney provisionally accepted a $1,000 retainer, which he said he would hold pending a check for conflicts of interest. When he discovered the conflict, the attorney promptly returned the retainer and told the defendant that a conflict of interest kept him from taking the case. (*Id.* at p. 2.)

Without analyzing the different circumstances and policy reasons that support a presumption that client confidences are shared within a firm, the district court concluded that the presumption was rebuttable in that case.

---

[4]Respondents also emphasize the Utah district court's comment in *Poly Software Intern., Inc.* v. *Su, supra,* 880 F.Supp. at page 1491, that if an initial interview automatically disqualified an attorney, a litigant could quickly force an opponent to seek inexperienced or out-of-state counsel by visiting a number of attorneys in the area. However, we do not hold that an "initial interview," as such, automatically disqualifies an attorney. In any event, nothing in this record suggests that Mobil could have interviewed enough attorneys to keep respondents from obtaining competent and capable counsel in the Los Angeles area.

(*INA*, *supra*, 635 F.Supp. at pp. 4-5.) The court found the presumption was overcome because the firm effectively screened the criminal attorney so as to prevent any disclosure of the defendant's confidences. (*Id.* at p. 5.) Furthermore, the district court concluded that, because the defendant delayed nearly five months before seeking the firm's disqualification, the public could perceive his motion as a tactic to delay the lawsuit and increase his opponent's expenses. (*Id.* at pp. 5-6.) Thus, the court concluded that granting disqualification would undermine public confidence in the legal system's integrity and that denying disqualification would not prejudice the defendant. (*Id.* at p. 6.)

Under similar circumstances, the court in *Hughes* v. *Paine, Webber, Jackson & Curtis Inc.* (N.D.Ill. 1983) 565 F.Supp. 663 addressed whether a firm had to be disqualified from a subsequent representation because of an earlier initial consultation with an adversary in the matter. Employing a subjective test, the court found an attorney-client relationship arose during the initial one-hour meeting because the prospective client consulted the attorneys in their professional capacity with a view toward retaining them as counsel. (*Id.* at p. 669.) Further, just as the lack of a retainer agreement did not preclude finding an attorney-client relationship, the length of the initial consultation did not preclude finding that material confidences were disclosed. (*Id.* at pp. 669-670.) However, the trial court allowed the firm to rebut the presumption that its attorneys shared the material client confidences obtained in the initial consultation. (*Id.* at p. 672.) The court denied the disqualification motion when it found that, in fact, the attorneys who conducted the initial consultation had not shared the confidences within the firm, which had imposed a screening arrangement as soon as it discovered the ethical conflict. (*Id.* at p. 673.)

Respondents' situation, however, does not involve discrete, successive conflicting representations in substantially related matters, as was the case in *INA* and *Hughes*. Rather, during overlapping periods of time, the Shapiro firm and Disner obtained material confidential information from parties on opposite sides of the same litigation. Even though *INA* and *Hughes* applied a more lenient approach to conflicts disqualification than prevails in California (see, e.g., *Henriksen* v. *Great American Savings & Loan, supra*, 11 Cal.App.4th at pp. 114-116), neither case suggests that a *rebuttable* presumption of shared confidences ought to apply in the circumstances present here. In any event, we need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm imposed effective screening procedures. The declarations the Shapiro firm submitted fail to demonstrate that any formal screening procedure

prevented attorneys working on respondents' behalf from being exposed to Mobil's confidences. (Cf. *id.* at p. 116, fn. 6.)[5]

The record here shows without contradiction that Disner received material confidential information concerning respondents' claims against Mobil. In his first telephone conversation with one of Mobil's attorneys, Disner discussed the substantive allegations, the procedural status, and Mobil's theories of the case. During their luncheon meeting, Mobil's attorneys again briefed Disner on Mobil's theories and on its attorneys' discovery strategy, analyses of the issues, and assessment of the state of the case. Moreover, he acted on some of that information and provided Mobil's attorneys with the results of his own research. Although Disner stated that he did not discuss "the merits" of the case with attorneys or employees of the Shapiro firm, the firm's declarations fail to establish that Mobil's confidences were unavailable to its adversaries' attorneys, or that effective screening procedures secured those confidences from disclosure.

Therefore, the undisputed facts established that, for purposes of a conflict of interest analysis, Disner represented Mobil. Consequently, Disner and the firm to which he was of counsel, the Shapiro firm, represented opposing parties in the same litigation. The potential for a breach of the duty of confidentiality, whether inadvertent or otherwise, is apparent. The record provides no basis for considering whether an ethical screen, or other means of protecting Mobil's confidences, could serve the same prophylactic purpose as disqualification. We turn, then, to the reasons for applying the rule of disqualification to attorneys of counsel to a firm.

### Imputed Disqualification and "Of Counsel" Attorneys

As amicus curiae, the State Bar of California, observes, "The 'of counsel' designation has, over the years, come to mean a variety of things in

---

[5]Disner's declaration stated only that "I have not discussed the merits of this action with any attorney or other employee at [the Shapiro firm], nor do I intend to." The declaration does not address the implication Disner discussed something other than "the merits" of the case, or what information he might exclude from the scope of "the merits." The declaration also does not disclose whether Disner had any notes or memoranda from his discussions with the Cohon and Gardner attorneys and, if so, who had access to them. Shapiro's declaration similarly stated that he had not discussed the action with Disner and would not do so in the future. He also disclaimed any knowledge of what Disner discussed with Mobil's attorneys. Likewise, Goebel's declaration stated only that he never met or spoke with Disner.

However, at least two other attorneys at the Shapiro firm also represented respondents and worked with Goebel. No declaration addressed whether those attorneys had access to, or were exposed to, Mobil's confidences. Moreover, none of the Shapiro firm's declarations suggested that it instituted any formal ethical screen to prevent even inadvertent disclosures after the problem became known.

jurisdictions across the nation." Attorneys who are of counsel to a firm may be permanent full-time practitioners who for various reasons are not on the traditional career path towards partnership in the firm. Of counsel attorneys also may be part-time affiliates of a firm who have other personal or professional commitments, or they may be potential partners brought into a firm for a probationary period. (See Buchholz, *Of Counsel: It's not just for retiring, anymore* (Oct. 1995) 81 ABA J. 70-74; ABA Com. on Ethics & Prof. Responsibility, Formal Opn. No. 90-357 (1990) p. 3; State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 1993-129, pp. 1-2.)

The minimum requirements for designating an attorney in California as being of counsel to a firm are found among the standards for communications that presumptively violate the prohibition against false or deceptive communications: "(8) A 'communication' which states or implies that a member or law firm is 'of counsel' to another lawyer or a law firm unless the former has a relationship with the latter (other than as a partner or associate, or officer or shareholder pursuant to Business and Professions Code sections 6160-6172) which is *close, personal, continuous, and regular.*" (Rules Prof. Conduct, rule 1-400(E), std. (8), italics added.)

We agree with the State Bar's view that the essence of the relationship between a firm and an attorney of counsel to the firm "is the closeness of the *'counsel'* they share on client matters. Members of the public are encouraged to consult with those sharing an 'of counsel' relationship with the expectation that the counselling resources of both are fully available to clients . . . ." (Original italics.) The same view was reflected in the Bar Association of San Francisco's Formal Opinion No. 1985-1: "[A] firm which lists an attorney as 'of counsel' on its letterhead, shingle or listing is making an affirmative representation to its clients that the services of that attorney are available to clients of the firm."

■ As noted earlier, the need to protect client confidences can cause one attorney's conflict of interest disqualification to be imputed to other attorneys in the same firm. (See pp. 1146-1147, *ante.*) When attorneys presumptively share access to privileged and confidential matters because they practice together in a firm, the disqualification of one attorney extends vicariously to the entire firm. (*Flatt, supra,* 9 Cal.4th at p. 283.) The vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each

other's, and their clients', confidential information.[6] The expectation that attorneys associated together will share confidences is reflected in the American Bar Association Model Rules of Professional Conduct, rule 1.6, comment [8]: "Lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, unless the client has instructed that particular information be confined to specified lawyers."

■ The close, personal, continuous, and regular relationship between a law firm and the attorneys affiliated with it as of counsel contains many of the same elements that justify the rule of vicarious disqualification applied to partners, associates, and members. An of counsel attorney, particularly one frequently in the firm's offices or in contact with the firm's attorneys, may be consulted on a variety of matters without being formally identified as cocounsel. This close, fluid, and continuing relationship, with its attendant exchanges of information, advice, and opinions, properly makes the of counsel attorney subject to the conflict imputation rule, regardless of whether that attorney has any financial stake in a particular matter. (Cf. *Cho* v. *Superior Court, supra*, 39 Cal.App.4th at pp. 124-126.)

We find persuasive amicus curiae the State Bar of California's conclusion in its 1993 ethics opinion on the subject: "[T]o the extent the relationship between a principal member [of the State Bar] or law firm and another member or law firm is sufficiently 'close, personal, regular and continuous,' such that one is held out to the public as 'of counsel' for the other, the principal and 'of counsel' relationship must be considered a single, de facto firm for purposes of rule 3-310. Accordingly, if the 'of counsel' is precluded from a representation by reason of rule 3-310 of the California Rules of Professional Conduct, the principal is presumptively precluded as well, and vice-versa." (State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 1993-129, *supra*, at pp. 5-6, fn. omitted.) The American Bar Association Committee on Ethics and Professional Responsibility reached the same conclusion in its Formal Opinion No. 90-357: "There can be no doubt that an of counsel lawyer (or firm) is 'associated in' and has an 'association with' the firm (or firms) to which the lawyer is of counsel, for purposes of both the general imputation of disqualification . . . and the imputation of disqualification resulting from former government service . . . . Similarly, the of counsel lawyer is 'affiliated' with the firm and its

---

[6]Respondents acknowledge as much in their brief in this court, when they stated: "Although [the Shapiro firm] and Mr. Disner only occasionally associated with each other on specific cases . . . , the relationship was still 'close, personal, continuous, and regular' in that Mr. Disner rented space in [the Shapiro firm's] offices, talked frequently with its attorneys, and discussed legal issues pertaining to cases other than this one."

individual lawyers for purposes of the general attribution of disqualifications under DR 5-105(d) of the Model Code. [Citations.]" (ABA Com. on Ethics & Prof. Responsibility, Formal Opn. No. 90-357, *supra*, at p. 4.) Notwithstanding the variations to be expected across the nation on any point of law, the prevailing view is that for purposes of disqualification, the of counsel attorney is considered to be affiliated with a firm so that the disqualification of one from representation must be imputed to the other. (See ABA, Lawyers Manual on Professional Conduct (Bur. Nat. Affairs 1990) pp. 91:501, 91:506.)

Respondents argue that Disner's of counsel position with the Shapiro firm was analogous to the relationship of cocounsel with respect to those matters for which they formally associated. Respondents therefore rely on *In re Airport Car Rental Antitrust* (N.D.Cal. 1979) 470 F.Supp. 495. There the court found no reason to presume that cocounsel conveyed confidential information to each other, and so the court did not impute one firm's disqualification to the other. (*Id.* at pp. 501-502.) However, regardless of the frequency with which Disner and the Shapiro firm formally associated for cases, or the independence of the business aspects of their practices, their basic relationship was "close, personal, continuous, and regular." Such a relationship, inherent in designating an attorney as of counsel to a firm, does justify a presumption that client confidences will be disclosed and exchanged in informal consultations. Hence, the conflict of interest of one will be imputed to the other, with the consequence that disqualification must follow.

In order to designate themselves as of counsel, attorneys must have close, personal, continuous, and regular relationships with their affiliated firms. Consequently, the attorneys brought together in these relationships frequently will have occasion to share client confidences in the course of exchanging advice and performing legal services for those clients. The fundamental nature of the relationship makes a presumption of shared confidences as appropriate for the of counsel attorney as it is for partners, associates, and members of law firms. From the clients' and the public's perspective, the of counsel attorney can hardly be distinguished from other attorneys who may be more closely tied to a firm financially. As a result, the need to preserve confidentiality and public confidence in the integrity of the legal profession and judicial process require that of counsel attorneys be regarded as the same as partners, associates, and members of law firms for conflict of interest issues.

In this case, the of counsel attorney obtained confidential information and provided legal services to Mobil. For conflict of interest purposes, the

attorney's involvement went beyond initial or peripheral contacts and rose to the level for which fiduciary duties of confidentiality and loyalty properly can be imposed. This development meant that Disner and the Shapiro firm represented adversaries in the same litigation, with the concomitant potential for a breach of the duty of confidentiality.

Disner's conflict of interest must be imputed to the Shapiro firm because of the public designation of their relationship. Consequently, Disner's conflict of interest must inevitably lead to the Shapiro firm's vicarious disqualification from representing respondents to assure the preservation of Mobil's confidences and the integrity of the judicial process.

### Conclusion

We reverse the judgment of the Court of Appeal and remand the cause to the Court of Appeal with directions to order further trial court proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**MOSK, J.**—I concur in the result.

An attorney who is designated of counsel to a law firm should be subject to the same rules as a partner or associate of the firm for conflicts purposes. This is a bright-line rule. We need not inquire into the particulars of the of counsel relationship in question.

Attorney Eliot G. Disner held himself out to the public as "of counsel" to the firm of Shapiro, Rosenfeld & Close, i.e., as having a "close, personal, continuous, and regular" relation with the firm. (Rules Prof. Conduct, rule 1-400(E), std. (8).) He must, accordingly, be considered a member of the firm for purposes of the vicarious disqualification rule, whatever the minutiae of how he and the rest of the Shapiro firm handled their billings and payroll.

It appears that there was a conflict of interest, albeit a brief one, between the interests of Disner, who received confidential information from and advised Mobil Oil Corporation, and the rest of the Shapiro firm, which was simultaneously associated as counsel for interveners in the same matter. Hence, the Shapiro firm must be disqualified per se. This, too, is a bright-line rule. As has previously been explained: "The paradigmatic instance of . . . prohibited dual representation—one roundly condemned by courts and

commentators alike—occurs where the attorney represents clients whose interests are *directly* adverse *in the same litigation.*" (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 284, fn. 3 [36 Cal.Rptr.2d 537, 885 P.2d 950]; see Rules Prof. Conduct, rule 3-310.) A simple conflicts check would have avoided the problem. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial 1 (The Rutter Group 1998) ¶ 1:71, pp. 1-19 to 1-20.)

I write separately because, in my view, this matter involves a straight-forward question of law, not of fact. The majority suggest, in my view incorrectly, that it matters how long the conflict herein lasted, how promptly Mobil sought to disqualify Disner, and whether attorneys from the Shapiro firm actually had access to Mobil's confidences. The precise details of the interactions between Disner and the Shapiro firm and their clients are not the point. Nor are we called upon to parse declarations by the attorneys that they did not discuss the merits of the action or intend to do so. Regardless whether any attorneys in the Shapiro firm apart from Disner were actually exposed to Mobil's confidences or instituted any formal "ethical screen" to preserve confidentiality, disqualification in these circumstances was auto-matic, as a breach of the twin duties of loyalty and confidentiality owed by an attorney to his client.

For these reasons, the judgment of the Court of Appeal should be reversed.