Filed 7/16/24  Martin v. Valtier CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID MARTIN,<br><br>     Plaintiff,<br><br>v.<br><br>KRISTIN VALTIER,<br><br>     Defendant and Respondent;<br><br>MICHELLE WOODRUFF,<br><br>     Real Party in Interest and Appellant | A167676<br><br>(Contra Costa County<br>Super. Ct. No. D2200789) |

Michelle Woodruff appeals an order disqualifying her from representing plaintiff David Martin in this family law action and imposing sanctions.  The basis of the order was that Woodruff communicated directly—and insultingly—to defendant Kristen Valtier, although Valtier was represented by counsel, in violation of Rules of Professional Conduct of the State Bar of California, Rule 4.2 (Rule 4.2).  We affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

The record before us contains limited information about the family law action underlying this order.  But it does show that on September 2, 2022, defendant Kristen Valtier filed a request for an order for Woodruff's recusal and for attorney fees as sanctions.  According to the request, at a hearing on

1

June 22, 2022, the trial court made multiple orders adverse to Woodruff's client: a domestic violence protection order, custody orders, and an order for child support. As soon as the judge left the courtroom, Woodruff "stormed" toward Valtier, saying, " 'This is a crock of shit' " and " 'You're so full of shit,' " and calling her a " 'lying bitch.' " Woodruff was visibly angry and was loud enough that others in the courtroom heard the outburst. The bailiff told her to leave the courtroom.

Valtier explained that after Woodruff spoke to her in this manner she was afraid, and her attorney asked for a deputy sheriff to escort her to her car. Valtier did not believe she would be able to participate effectively in court proceedings if Woodruff remained as Martin's counsel. She asked for Woodruff's disqualification and for sanctions of $10,000.

Woodruff filed a responsive declaration saying in part that Valtier's attorney alleges, "after [the judge] left the bench that I called his client names. Even if I did, which I deny, that is not tantamount to a violation of Rule 4.2." She asserted that since she was never in Valtier's presence without Valtier's attorney, H.F. Layton, also being present, any communications would not have violated Rule 4.2. She also said she would not have jeopardized her good reputation by doing the things defendant claimed.

The trial court found otherwise. At the January 5, 2023 hearing on Valtier's request, Valtier herself was not present, but her attorney Layton testified under oath. Layton said he was sitting with his client after the judge left the courtroom at the conclusion of the June 22, 2022 hearing and that he saw Woodruff stand up abruptly and begin walking deliberately toward Valtier. Woodruff walked behind Layton to address Valtier directly, saying in a loud tone the things alleged in the recusal request—including

2

that the court's ruling was a "[c]rock of shit" and that Valtier was a " 'lying bitch.' " Layton looked at the bailiff, who told Woodruff to leave the courtroom.

Woodruff's testimony was more equivocal. The trial court asked if she had said something to the effect of, "This is a crock of shit," and she initially denied it. Asked if she said something like, "You are so full of shit," she replied "I didn't direct—I did not, no." Asked if she expressed any sentiments to that effect, she said, "I did not—not direct—Your Honor, I did not direct either to Mr. Layton or to his client." The court noted, "Well, that's a significant caveat." The court pressed her on whether she had ever muttered anything to that effect under her breath or used the word "shit," and she first said, "I did not, not anytime," then added, "Not in the way that it is alleged in this motion." Inquiring further, the court asked whether she had used that word, and she replied, "Not in the courtroom." The court said, "[S]o, after, was anything like this said outside the courtroom?" and she replied, "Not in anybody's presence. I was by myself." The court asked if the allegations were a complete fabrication, and Woodruff replied, "I don't know, Your Honor—I don't know what Mr. Layton—I'm not going to say that he fabricated—no, that's not what I am saying. [¶] What I am saying is: I did not do what Mr. Layton alleges in his moving papers[, ¶] . . . [¶] [a]nd the allegations are incorrect." The court asked if she wished to say anything else, and Woodruff indicated she had nothing to say but what was in her responsive declaration. Questioned by Layton, Woodruff denied that she said the things alleged in the moving papers at any time on the day of the hearing and she said she did not recall the bailiff asking her to leave.

The trial court found Layton's testimony credible and Woodruff's denials not credible, and found that Woodruff had said the things alleged in

3

the moving papers in violation of Rule 4.2(a). The court found that Woodruff's misconduct would affect another pending proceeding between the parties and disqualified her from acting as counsel for Martin in that proceeding as well. It also found Woodruff committed misconduct that justified sanctions under Family Code section 271, and it set a further hearing to determine the amount. Woodruff has appealed from this order.[1]

## DISCUSSION

### I.  Violation of Rule 4.2

Woodruff's first contention is that the evidence is insufficient to show she violated Rule 4.2(a), which provides:  "In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."  (See *Big Lots Stores*, *Inc. v. Superior Court* (2020) 57 Cal.App.5th 773, 781.)

Woodruff does not dispute on appeal that she spoke to Valtier after the hearing, but argues rather that her insulting and offensive statements did not concern the subject of the representation, that the proceeding was over because the court had ruled on Valtier's request, and that through his presence Valtier's counsel implicitly consented to the communication.

Woodruff characterizes the "subject of the representation" as "whether or not [Martin] committed acts enjoined under the Domestic Violence Protection Act against [Valtier]."  Even assuming this defines the scope of Woodruff's representation of Martin, her comments—which impugned the result of the proceeding and Valtier's honesty in bringing the allegations forward—appear to concern that subject.  And there is nothing to suggest

---

[1] An order disqualifying counsel is directly appealable.  (*Reich v. Club Universe* (1981) 125 Cal.App.3d 965, 969.)

4

that, after the trial court made its ruling at the June 22, 2022 hearing but while the parties were still in the courtroom, her representation of Martin had ended.

As to counsel's implied consent, Woodruff relies on *Mitton v. State Bar* (1969) 71 Cal.2d 525, 534, which considered a rule barring an attorney from "communicat[ing] with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel." In explaining that this rule was designed to prevent an opposing attorney from impeding counsel's performance, our high court noted, "If a party's counsel is present when an opposing attorney communicates with a party, counsel can easily correct any element of error in the communication or correct the effect of the communication by calling attention to counteracting elements which may exist." (*Ibid.*) *Mitton* does not assist Woodruff. Rule 4.2(a) is not limited to communications made in the absence of the party's counsel; rather, it applies by its terms to *all* communications made without counsel's consent. And there is nothing in this record to show counsel consented to Woodruff approaching Valtier and speaking to her in vulgar and insulting terms and an angry manner. The evidence was sufficient to show a violation of Rule 4.2(a).

## II.    Evidentiary Issues

Woodruff challenges two of the trial court's evidentiary rulings. First, Layton testified that, after Woodruff spoke to Valtier at the June 22, 2022 hearing, Layton "looked at the bailiff, and the bailiff then told Ms. Woodruff that she had to leave the courtroom, and she left." Woodruff objected that this testimony was hearsay, and the trial court said, "Well, I presume it's not being offered for the truth but rather the effect on the hearer, is that correct, Mr. Layton?" Layton replied, "Correct," and the trial court overruled the

5

objection. Layton then testified that Woodruff "stormed out of the courtroom."

Woodruff states that the trial court exceeded its jurisdiction when it suggested the evidence of the bailiff's statement was not being offered for the truth of the statement. But she provides no reasoned argument or citation to authority to support this argument, and she has therefore forfeited it. (See *Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1 (*Okasaki*).)

Woodruff also argues that she was not afforded the opportunity to place the bailiff's statement in context or to seek testimony about the tone of the bailiff's voice. This argument is meritless. Woodruff cross-examined Layton and she asked him nothing about what the bailiff said or how he said it. She points to nothing to suggest the trial court prevented, or would have prevented, her from doing so.

As her final evidentiary point, Woodruff contends the trial court erred when it sustained an objection to one of her questions on cross-examination. Woodruff asked Layton whether he alleged she initiated contact with Valtier outside Layton's presence, and Layton replied that he was not saying any contact took place outside his presence. Woodruff then asked him, "And do you agree that there would be no Rule 4.2 violation in the absence of that allegation?" Layton objected that the question was argumentative, and the trial court sustained the objection.

Woodruff draws our attention to *People v. Guerra* (2006) 37 Cal.4th 1067, 1125, which defines an argumentative question as one that is "designed to engage a witness in argument rather than elicit facts within the witness's knowledge." She argues that, rather than inviting an argument with Layton, she was merely seeking his knowledge as to the question she posed. This

6

argument fails. Woodruff's question was not directed toward Layton's knowledge of any pertinent facts but rather toward his opinion on the scope of Rule 4.2—a legal matter for the court, not for a witness, whether percipient or expert. (See *People v. Jones* (2013) 57 Cal.4th 899, 950.) While Woodruff could properly argue this issue to the court, there was no abuse of discretion in sustaining Layton's objection to the question.

## III. Propriety of Disqualification

Woodruff makes a number of substantive challenges to the order disqualifying her from representing Martin.

A trial court, in its discretion, may disqualify counsel under its "inherent power to regulate the conduct of court officers, including attorneys, in furtherance of the sound administration of justice. [Citations.] Although the right to counsel of one's choice is an important one, it 'must yield to ethical considerations that affect the fundamental principles of our judicial process.'" (*City of San Diego v. Superior Court* (2018) 30 Cal.App.5th 457, 469–470 (*City of San Diego*).) Our high court has explained that "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil Change*).)

The trial court balances competing policy considerations in deciding whether to disqualify an attorney; those considerations include, on the one hand, the hardship on the client of the disqualified attorney, who must bear the costs of finding a replacement, and the possibility that the moving party seeks disqualification for tactical purposes. (*SpeeDee Oil Change*, *supra*, 20 Cal.4th at p. 1145; *City of San Diego*, *supra*, 30 Cal.App.5th at p. 470.) On the other hand, "a court must not hesitate to disqualify an attorney when it is

7

satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a continuing effect on the proceedings before the court." (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 300 (*Gregori*).)

We normally review a decision to disqualify an attorney for abuse of discretion (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 782), although if there are no material disputed factual issues we review the trial court's determination as a question of law (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 848). Because there are disputed factual issues here, we must determine whether the trial court abused its discretion under the standards we have outlined. In carrying out our review, we bear in mind the fundamental principle of appellate review that a judgment is presumed correct, and the appellant has the burden to demonstrate, on the basis of the appellate record, that reversal is justified. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*).)

We see no abuse of discretion. Woodruff contends the trial court did not consider Valtier's delay in filing the motion to disqualify her. That is, the disqualification request was not brought until September 2, 2022, two and a half months after the June 22, 2022 domestic violence trial and, she tells us, while the request was pending Woodruff attended two additional hearings with her client, one for custody and visitation and the other for child support.

Woodruff relies upon two federal district court cases stating that in determining whether a party has waived its right to object to opposing counsel, the court must consider the length of the delay in moving to disqualify, when the moving party learned of a conflict and whether that party was represented by counsel in the meantime, why the delay occurred,

8

and whether the non-moving party would be prejudiced. (*Geissal v. Moore Medical Corp.* (E.D.Mo. 2000) 92 F.Supp.2d 945, 946; *Alexander v. Primerica Holdings, Inc.* (D.N.J. 1993) 822 F.Supp. 1099, 1115.) And, she points out, a federal appellate court has stated that a motion to disqualify should be brought with "reasonable promptness after a party discovers the facts which lead to the motion." (*Central Milk Producers Cooperative v. Sentry Food Stores, Inc.* (8th Cir. 1978) 573 F.2d 988, 992.)

Woodruff suggests that under these standards, Valtier waited too long to seek disqualification. But she points to nothing in the record to indicate the reason for the delay and no finding that a delay of two and a half months was unreasonable under the circumstances. Woodruff suggests that the trial court did not allow evidence of the reasons for the delay, but again, she points to nothing in the record indicating the trial court prevented her from introducing any relevant evidence on this point.

Woodruff also relies on the two additional hearings that she tells us the parties participated in while the disqualification request was pending. Based on these hearings, which she asserts were productive, she argues both that Martin became more committed to the attorney-client relationship during this time—thus establishing prejudice—and that disqualification was shown to be unnecessary because Valtier was able to participate in the proceedings, even as Woodruff continued to represent Martin. But Martin provided neither a declaration nor testimony showing that he suffered prejudice from the disqualification, and Woodruff points to no other evidence in the record to support her assertions. In short, this record does not support her claim.

Woodruff also argues the trial court's ruling was excessively punitive.[2] She is correct that the purpose of disqualification is not to punish an attorney's bad behavior. (*City of San Diego*, *supra*, 30 Cal.App.5th at p. 470.) But there is no indication here that the trial court sought to punish Woodruff rather than to protect the integrity of the judicial proceedings.

Finally, Woodruff invokes *Gregori* as the precedent most supportive of her appeal. But *Gregori* involved very different facts—a social relationship between a lawyer and his adversary's secretary—and the trial court *denied* the motion to disqualify counsel in that case. (*Gregori*, *supra*, 207 Cal.App.3d at pp. 296–299.) That this outcome was no abuse of discretion tells us little about whether granting the motion to disqualify was an abuse of discretion here. (*Id.* at p. 310.) We conclude it was not. Woodruff has not met her burden to show a reversible abuse of discretion. (See *Jameson*, *supra*, 5 Cal.5th at pp. 608–609.)

## DISPOSITION

The order is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Martin v. Valtier* (A167676)

---

[2] The heading to Woodruff's final argument also asserts that the trial court exceeded its jurisdiction in barring her from representing Martin in multiple actions. But she presents no argument on this point and has therefore forfeited it. (See *Okasaki*, *supra*, 203 Cal.App.4th at p. 1045, fn. 1.)